**VALERO TERRESTRIAL CORPORATION, Lackawanna Transport Co., and Solid Waste Services, Inc. d/b/a J.P. Mascaro & Sons, Plaintiffs,**

v.

**The Honorable Laidley Eli McCOY, Director, Division of Environmental Protection of the Department of Labor, Commerce and Environmental Resources of the State of West Virginia, The Honorable B.F. "Cap" Smith, Chief of the Division of Waste Management for the Division of Environmental Protection, The Public Service Commission,**

---

The Honorable James H. Paige, Secretary, Department of Tax and Revenue for the State of West Virginia and The Honorable Darrell V. McGraw, Jr., Attorney General of the State of West Virginia, Defendants.

No. 5:93CV189.

United States District Court,
N.D. West Virginia.

Sept. 17, 1997.

William F. Fox, Jr., Harleysville, PA, Logan M. Hassig, Snyder & Hassig, New Martinsville, WV, Bruce L. Thall, Spector, Gadon & Rosen, PC, Philadelphia, PA, for Valero Terrestrial Corporation, plaintiff.

William F. Fox, Jr., Logan M. Hassig, Bruce L. Thall, (See above), for Lackawanna Transport Co., plaintiff.

William F. Fox, Jr., Logan M. Hassig, Bruce L. Thall, (See above), for Solid Waste Services, Inc., d/b/a J.P. Mascaro & Sons, plaintiff.

Silas B. Taylor, Atty. Gen. Office, Charleston, WV, for James H. Paige, Secretary, Dept. of Tax and Revenue of the State of West Virginia, defendant.

Silas B. Taylor, (See above), for Darrell V. McGraw, Jr., Honorable, Attorney General of the State of West Virginia, defendant.

Armando F. Benincasa, Charleston, WV, Matthew B. Crum, Division of Environmental Protection, Charleston, WV, William E. Adams, Division of Environmental Protection, Nitro, WV, for B.F. "Cap" Smith, Chief of the Division of Waste Managment for the Division of Environmental Protection, defendant.

Armando F. Benincasa, Matthew B. Crum, William E. Adams, (See above), for Laidley Eli McCoy, Director, Division of Environmental Protection of the Dept. of Labor, Commerce and Environmental Resources of the State of WV., defendant.

Larry Harless, Spring Valley, NY, respondent pro se.

## MEMORANDUM OPINION AND ORDER

STAMP, District Judge.

### I. *Introduction*

In the early 1990s, the West Virginia Legislature enacted various statutes seeking to address certain environmental and other concerns dealing with solid waste collection, disposal and management.

West Virginia Senate Bill 18, effective October 18, 1991 (hereinafter "S.B. 18"), and Senate Bill 288, effective April 18, 1993 (hereinafter "S.B. 288")[1] contain provisions governing the solid waste landfilling and sewage sludge compacting industries in West Virginia. Specifically, S.B. 18 outlines the requirements for obtaining a permit to open and/or operate a commercial solid waste facility in West Virginia, sets forth solid waste assessments to be imposed upon in-state and out-of-state solid waste landfills in West Virginia, and places limitations upon the amount

---

**1.** The parties in their pleadings and other papers have referred to this legislation by using the Senate bill numbers. The bills, as enrolled, enact or amend provisions of the West Virginia Code. This Court, while referring from time to time to "S.B. 18" and "S.B. 288," has adopted throughout this opinion the preferable method of also citing the specific statutes involved.

of solid waste a commercial facility can dispose of on the land each month. S .B. 288 requires a solid waste facility to include sewage sludge composting facilities and non-landfilled sewage sludge in the amount of solid waste that is subject to the monthly limitations announced in S.B. 18, and it imposes solid waste assessments upon unlandfilled sewage sludge. Although most of the provisions of S.B. 18 and S.B. 288 were subsequently repealed and reenacted in virtually identical form by the West Virginia legislature, the differential solid waste assessments were repealed in their entirety.

Plaintiffs are corporations engaged in the commercial solid waste landfilling and sewage sludge composting industries in West Virginia. As part of their operations, plaintiffs transport solid waste generated outside West Virginia to its sites inside West Virginia. Additionally, plaintiffs import sewage sludge generated in locations outside West Virginia to its facilities inside West Virginia for composting and resale. Plaintiffs operate the only permitted sewage sludge composting facilities in West Virginia.

After the enactment of S.B. 18 and S.B. 288, plaintiffs were required to include the sewage sludge composted at their facilities in the computation of "solid waste." Further, plaintiffs were subject to a "tonnage cap" on the amounts of solid waste, including sewage sludge, that their facilities could receive each month. Plaintiffs were required to pay solid waste assessments, including additional assessments for wastes imported from out-of-state, on solid waste landfilled and on sewage sludge composted each month. Additionally, the enactments required all commercial landfills to first meet local solid waste disposal needs and required permitted solid waste authorities to amend commercial landfill permits to ensure that the present and future needs of the local area were met. Finally, the statutes necessitated that plaintiffs meet strict requirements, including administrative approvals and voter referenda, before enlarging, expanding or opening new solid waste and sewage sludge facilities.

Because of these changes to the West Virginia Code, plaintiffs filed suit against defendants in this Court alleging that the newly-enacted statutes violated the Commerce Clause, Due Process Clause, and Equal Protection Clause of the United States Constitution and that they violated plaintiffs' civil rights under 42 U.S.C. § 1983. This Court found that it had jurisdiction over the matter and preliminarily enjoined defendants from enforcing these statutes on the ground that the statutes violated the Commerce Clause. Plaintiffs seek an order that declares portions of S.B. 18 and S.B. 288, and the resulting codifications dealing with solid waste and sewage sludge, to be unconstitutional; enjoins defendants from enforcing the unconstitutional provisions; compels the state to refund fees paid pursuant to the differentiated assessment statutes; and awards plaintiffs their reasonable fees and costs incurred in prosecuting this action pursuant to 42 U.S.C. § 1988.

## II. *Procedural History*

On November 4, 1993, plaintiffs Valero Terrestrial Corporation ("Valero"), Lackawanna Transport Company ("Lackawanna"), and Solid Waste Services, Inc., doing business as J.P. Mascaro & Sons ("SWS"), filed a complaint for declaratory judgment against defendants: The Honorable David Callaghan, Director, Division of Environmental Protection and the Department of Labor, Commerce and Environmental Resources of the State of West Virginia; The Honorable John Ranson, Secretary, Department of Labor, Commerce and Environmental Resources of the State of West Virginia; The Honorable George Max Robertson, Chief of the Division of Waste Management for the Division of Environmental Protection; The Public Service Commission of the State of West Virginia; The Honorable James H. Paige, Secretary, Department of Tax and Revenue of the State of West Virginia; and The Honorable Darrell V. McGraw, Jr., Attorney General of the State of West Virginia. On October 27, 1995, Laidley Eli McCoy was substituted for David Callaghan, and B.F. "Cap" Smith was substituted for George Max Robertson. Additionally, on January 19, 1996, this Court entered an order dismissing John Ranson from this action.

On November 4, 1993, plaintiffs filed a motion for a temporary restraining order and

a motion for a preliminary injunction requesting that this Court enjoin defendants from enforcing various provisions of the West Virginia Code. On November 15, 1993, this Court granted plaintiffs' motion for a temporary restraining order and scheduled a hearing on the motion for a preliminary injunction. After a number of continuances, this Court conducted a six-day preliminary injunction hearing.

On September 28, 1995, this Court granted plaintiffs' motion for a preliminary injunction on the basis that the statutes challenged by plaintiffs were unconstitutional. Further, this Court denied defendants' motion to compel the refund of certain fees paid by plaintiff and granted plaintiffs their reasonable attorney's fees in bringing this action. In a separate order entered the same day, this Court resolved a number of outstanding issues, including denying the motion of the Secretary of the Department of Tax and Revenue to dismiss plaintiffs' tax related claims.

Subsequent to the September 28, 1995 orders, the defendants filed motions requesting that this Court vacate, reconsider or clarify its preliminary injunction order. On December 14, 1995, this Court entered an order that granted the Public Service Commission's motion for clarification and amendment of the judgment; granted defendant Callaghan and Robertson's motion for clarification; denied Paige's motion for reconsideration; denied McGraw's motion to vacate; denied Callaghan, Robertson and the Public Service Commission's motion to stay the preliminary injunction order; denied the defendants' joint motion to dismiss the pleadings; stayed the award of attorney's fees pursuant to 42 U.S.C. § 1988; and determined the amount of sanctions to be paid by attorney Larry Harless. The order of clarification indicated that the preliminary injunction order was not a final determination on the constitutionality of the challenged statutes and clarified certain limitations on the preliminary injunction order. Additionally, the order directed the parties to submit recommendations as to the type and amount of bond to be posted by plaintiffs.

On January 19, 1996, this Court entered an order setting plaintiffs' bond at $50,000.00.

On January 29, 1996, plaintiffs posted the $50,000.00 bond. This Court then entered a scheduling order setting deadlines for discovery and for the filing of dispositive motions. After a number of discovery disputes and continuances of the discovery and motion deadlines, the parties filed a number of dispositive motions as listed below:

1. On July 22, 1996, defendant Paige filed a motion to dismiss Count I(a)(1) of the complaint for lack of subject matter jurisdiction. On August 6, 1996, plaintiffs filed a response to that motion. On August 13, 1996, defendant Paige filed a reply in support of his motion.

2. On July 22, 1996, plaintiffs filed a motion for entry of declaratory judgment and permanent injunction. On September 27, 1996, defendant Public Service Commission filed a response to plaintiffs' motion. Also on September 27, 1996, defendants McCoy and Smith filed a response to plaintiffs' motion. On October 2, 1996, plaintiffs filed a reply to defendants McCoy and Smith's response. On October 4, 1996, plaintiffs filed a reply to the response of the Public Service Commission. On December 13, 1996, the Public Service Commission filed a supplemental response to the declaratory judgment and permanent injunction motion. Further, on December 13, 1996, plaintiffs filed an additional responsive memorandum regarding defendants' dormant commerce clause contentions. Finally, on December 16, 1996, defendants Paige and McGraw filed a response to plaintiffs' motion.

3. On July 23, 1996, defendants McCoy and Smith filed a motion for partial summary judgment. On August 1, 1996, plaintiffs filed a response to that motion. On October 4, 1996, defendants McCoy and Smith filed a reply in support of their motion.

4. On July 23, 1996, defendant Paige filed a motion for summary judgment on all claims pertaining to the constitutionality of the state's solid waste disposal taxes. On August 6, 1996, plaintiffs filed a response to the motion. On October 7, 1996, defendant Paige filed a reply in support of his motion.

5. On July 23, 1996, defendants McGraw and Paige filed a motion to dismiss plaintiffs'

complaint on the basis of "unclean hands." Subsequently, a corrected courtesy copy of the motion was submitted to this Court. On August 6, 1996, plaintiffs filed a response in opposition to the motion. No reply was filed.

6. On July 23, 1996, defendant Public Service Commission filed a motion for summary judgment on the constitutionality of West Virginia's certificate of need statute, of West Virginia's legislatively established tonnage caps, and of the Commission's independent statutory authority to impose tonnage caps. On August 1, 1996, plaintiffs filed a response to that motion. On October 4, 1996, defendant Public Service Commission filed a reply in support of its motion. Subsequently, on December 24, 1996, the Public Service Commission filed a supplemental reply memorandum. On March 21, 1997, the Public Service Commission filed a second supplemental memorandum in support of its motion. Finally, on April 2, 1997, plaintiffs filed a response to the supplemental memorandum.

7. On July 23, 1996, defendant Public Service Commission filed a motion for the modification of this Court's September 28, 1995 and December 14, 1995 orders to remove the Commission from the enjoined defendants. Additionally, on July 23, 1996, defendant Public Service Commission filed a motion for judgment on the pleading or summary judgment on the issue of this Court's lack of jurisdiction over the Public Service Commission. On July 29, 1996, plaintiffs filed a response to the Public Service Commission's motions. Finally, on October 4, 1996, the Public Service Commission filed a reply in support of its motions.

8. On September 4, 1996, plaintiffs filed a motion to substitute the real party in interest or, in the alternative, to dismiss defendant Public Service Commission from this action. On September 19, 1996, the Public Service Commission filed a response to the motion. No reply has been filed.

9. On July 23, 1996, defendants Paige and McGraw filed a motion requesting that this Court abstain from deciding the merits of plaintiffs' complaint pending the disposition of numerous enforcement proceedings in state tribunals which have been disrupted by the pendency of this action. On August 14, 1996, plaintiffs' filed a response to that motion. Finally, on August 19, 1996, defendants Paige and McGraw filed a reply in support of their motion.

10. On August 13, 1996, defendants filed a joint motion to dissolve the preliminary injunction based upon plaintiffs' misrepresentations of facts upon which the preliminary injunction was based. On September 4, 1996, plaintiffs' filed a response to that motion. Finally, on September 16, 1996, defendants filed a reply in support of their motion.

### III. *Summary of Opinion*

As set forth below, this Court finds that plaintiffs have successfully shown that the West Virginia statutes that impose fees upon unlandfilled sewage sludge; impose tonnage caps upon solid waste, requiring the inclusion of sewage sludge within these caps; require commercial solid waste facilities to first meet the needs of the local wasteshed or county; allow solid waste authorities to amend a solid waste facility permit to ensure that the local solid waste disposal needs will be met; and impose procedures upon commercial solid waste facilities to open, site, expand or increase the volume of a facility, which includes obtaining a certificate of need and approval by administrative bodies and by voter referenda, discriminate against out-of-state solid waste and sewage sludge in violation of the Dormant Commence Clause of the United States Constitution.

At the same time, this Court finds that defendants have correctly asserted that this Court is prohibited by the Eleventh Amendment from considering the constitutionality of the repealed differential assessments placed upon out-of-state waste and from exercising jurisdiction over the Public Service Commission. Further, this Court finds that it is not required to abstain from deciding the merits of this case and is not precluded by the "clean hands" doctrine, inartful pleading, or the Tax Injunction Act from considering the merits of plaintiffs' claims. Additionally, this Court finds that plaintiffs have failed to show that, as a matter of law, the challenged solid waste and sewage sludge statutes violate the Due Process Clause and

the Equal Protection Clause. Finally, this Court finds its earlier order granting plaintiffs an award of attorney's fees was premature and should be reconsidered upon additional briefing.

### IV. *Undisputed Facts*

1. Valero is a West Virginia corporation which owns and operates two separate solid waste facilities located in Colliers, Brooke County, West Virginia: the Brooke County Sanitary Landfill and the Brooke County Composting Facility.

2. Lackawanna is a West Virginia corporation which owns and operates two solid waste facilities in New Martinsville, Wetzel County, West Virginia: the Wetzel County Sanitary Landfill and the Wetzel County Composting Facility.

3. Valero and Lackawanna operate the only permitted commercial composting facilities in the state.

4. SWS is a Pennsylvania corporation engaged in the business of collecting, transporting, recycling and disposing non-hazardous solid wastes and hauling such wastes to interstate locations such as Valero and Lackawanna.

5. The West Virginia legislature enacted S.B. 18 and S.B. 288 to regulate solid waste and sewage sludge composting facilities in West Virginia.

6. Plaintiffs challenge the following statutory provisions enacted as part of S.B. 18 and S.B. 288 as unconstitutional:

a. *Repealed Differentiated Solid Waste Assessments*

1. W.Va.Code § 20–5F–5a(a) (enacted by S.B. 18, repealed by Acts of the Legislature 1993, C. 126 (hereinafter "Acts 1993") and Acts of the Legislature 1994, C. 61 (hereinafter "Acts 1994")), which provides in pertinent part:

2. The text of the statute currently in effect, W.Va. Code § 22–15–10(f) (1994), provides in pertinent part:
A commercial solid waste facility shall first ensure that the disposal needs of the wasteshed in which it is located are met. If one or more local solid waste authorities in the wasteshed

A solid waste assessment fee is hereby levied and imposed upon the disposal of solid waste at any solid waste disposal facility in this state to be collected and paid as follows ... [o]ne dollar ... per ton or part thereof of solid waste ... for solid waste generated from sources outside the solid waste disposal shed in which the solid waste disposal facility is located.

2. W.Va.Code § 20–5F–12 (enacted by S.B. 18, repealed by Acts 1993 and Acts 1994), which provides in pertinent part:
[T]he county commission of any county containing a Class A [solid waste] facility may ... impose a fee, not to exceed five dollars per ton of solid waste received from outside the wasteshed in which the facility is located ... for solid waste disposed in said facility.

3. W.Va.Code § 20–5N–4(i) (enacted by S.B. 18, repealed by Acts 1993 and Acts 1994), which provides in pertinent part:
Additional fee for out of shed waste.—...
[T]here shall be imposed an additional two dollar fee on the disposal of solid waste generated outside of the wasteshed wherein the solid waste disposal facility is located.

4. W.Va.Code § 20–5N–4(a) (enacted by S.B. 18, repealed by Acts 1993 and Acts 1994), which provides in pertinent part:
A solid waste assessment fee is hereby levied and imposed upon the disposal of solid waste at any solid waste disposal facility in this state in the amount of four dollars per ton or like ratio ... except [that certain uses are exempt from the fee and out-of-shed waste is subject to an additional two dollar fee].

b. *Requirement to Meet Local Needs*

W.Va.Code § 20–5F–5(f) (enacted by S.B. 18, repealed and reenacted as amended by Acts 1994 at W.Va.Code § 22–15–10(f)[2]), which provides in pertinent part:

in which the facility is located determine that the present or future disposal needs of the wasteshed are not being, or will not be, met by the commercial solid waste facility, such authorities may apply to the director [of the division of environmental protection] to modify the applicable permit. The director, in consulta-

[A] commercial solid waste facility shall first ensure that the disposal needs of the county, or if applicable the region, in which it is located are met. If the county solid waste authority, or regional solid waste authority if applicable, in which the facility is located determines that the present or future disposal needs of the county, or if applicable the region, are not being, or will not be, met by the commercial solid waste facility, such authority may apply to the director of the division of natural resources to modify the applicable permit in order to reduce the total monthly tonnage of out of county waste, or if applicable, out of region waste, the facility is permitted to accept by an amount that shall not exceed the total monthly tonnage generated by the county, or if applicable the region, in which the facility is located.

c. *Requirement to Obtain Certificate of Need and Procedure*

1. W.Va.Code § 20–5F–5(g) (enacted by S.B. 18, repealed and reenacted by Acts 1994 at W.Va.Code § 22–15–10(g)) which provides in pertinent part:

[A] permit to construct a new commercial solid waste facility or to expand the spatial area of an existing facility, not otherwise allowed by an existing permit, may not be issued unless the public service commission has granted a certificate of need. . . .

2. W.Va.Code § 24–2–1c(b) through (f) (enacted and rewritten by S .B. 18, technically amended by Acts 1994) provides in pertinent part:[3]

(b) Any person applying for a permit to construct, operate or expand a commercial solid waste facility as defined in . . . this code, or any person seeking a major permit modification from the division of natural resources first shall obtain a certificate of need from the public service commission. . . . The commission shall grant or deny a certificate of need, in accordance with provisions set forth in this chapter. If the commission grants a certificate of need, the commission may include conditions not inconsistent with the criteria set forth in this section.

(c) For purposes of subsections (a) and (b) of this section, a complete application shall consist of the following and notwithstanding any other provision of this chapter to the contrary, such information contained in the application provided by the applicant shall not be confidential and shall be disclosable pursuant to the [applicable] provisions . . . of this code:

(1) The names of the owners or operators of the facility including any officer, director, manager, person owning five percent or more interest or other person conducting or managing the affairs of the applicant or of the proposed facility;

(2) The proposed or existing location of the facility;

(3) A description of the geographic area to be served by the facility;

(4) The anticipated total number of citizens to be served by the facility;

(5) The average monthly tonnage of solid waste to be disposed of by the facility;

(6) The total monthly tonnage of solid waste for which the facility is seeking a permit from the division of natural resources;

(7) The anticipated life span and closure date of the facility; and

(8) Any other information requested on the forms prescribed by the public service commission.

(d) In considering whether to grant a certificate of need the commission shall consider, but shall not be not limited to considering, the following factors:

(1) The total tonnage of solid waste generated within the county;

---

tion with the solid waste management board, may then modify the applicable permit in order to reduce the total monthly tonnage of out of wasteshed waste the facility is permitted to accept by an amount that shall not exceed the total monthly tonnage necessary to ensure the disposal needs of the wasteshed in which the facility is located.

**3.** The 1994 amendment imposed the following relevant changes: it substituted "environmental protection" for "natural resources" throughout the section; substituted "is not" for "shall not be" in (c) and (d); and substituted "consists" for "shall consist" in (c).

(2) The total tonnage of solid waste generated within the wasteshed;

(3) The current capacity and life span of other solid waste facilities located within the county, if any;

(4) The current capacity and life span of other solid waste facilities located within the wasteshed, if any;

(5) The current capacity and life span of other solid waste facilities located within this state;

(6) The life span of the proposed or existing facility;

(7) The cost of transporting solid waste from the points of generation within the county or wasteshed and the disposal facility;

(8) The impact of the proposed or existing facility on needs and criteria contained in the statewide solid waste management plan; and

(9) Any other criteria which the commission regularly utilizes in making such determinations.

(e) The public service commission shall deny a certificate of need upon one or more of the following findings:

(1) The proposed capacity is unreasonable in light of demonstrated needs;

(2) The location of the facility is inconsistent with the statewide solid waste management plan;

(3) The location of the facility is inconsistent with any applicable county or regional solid waste management plan;

(4) The proposed capacity is not reasonably cost effective in light of alternative disposal sites;

(5) The proposal, taken as a whole, is inconsistent with the needs and criteria contained in the statewide solid waste management plan; or

(6) The proposal, taken as a whole, is inconsistent with the public convenience and necessity.

(f) Any certificates of need granted pursuant to this section shall be conditioned on acceptance of:

(1) Solid waste generated within the county in which the facility is or is to be located; and

(2) Solid waste generated within the wasteshed in which the facility is or is to be located.

d. *Danger of Unknown Solid Waste*

W.Va.Code § 20–5F–1(c), (enacted by Senate Bill. No. 18, repealed and reenacted by Acts 1994 at W.Va.Code § 22–15–1(c)[4]), which provides in pertinent part:

> The Legislature ... finds that disposal in West Virginia of solid waste of unknown composition threatens the environment and the public health, safety and welfare, and therefore, it is in the interest of the public to identify the type, amount and origin of solid waste accepted for disposal at West Virginia solid waste facilities.

e. *Approval Process for Opening or Expanding Solid Waste Facility*

1. W.Va.Code § 20–9–12b (enacted by S.B. 18, repealed and reenacted with technical amendments as amended by Acts 1994 at W.Va.Code § 22C–4–25(a)) which provides in pertinent part:

> (a) It is the intent of the Legislature that all commercial solid waste facilities operating in this state must receive site approval at the local level.... [Facilities] which seek to expand spatial area or to convert from a Class B facility to a Class A facility, shall obtain such approval only in the manner specified [by statute]....
>
> (b) In considering whether to issue or deny the certificate of approval ... the ... solid waste authority or county commission shall base its determination upon the following criteria: The efficient disposal of solid waste generated within the county or region....

2. W.Va.Code § 20–9–12c (enacted by S.B. 18, repealed and reenacted with technical amendments by Acts 1994 at W.Va.Code § 22C–4–26) which provides in pertinent part:

> (a) Except as provided below with respect to Class B facilities, ... in order to obtain

**4.** W.Va.Code § 22–15–1(c) changes "unknown composition" to "unknown origins."

approval to operate a new Class A facility, an applicant shall:

(1) File an application for a certificate of need with, and upon approval from, the public service commission;

(2) File an application for a certificate of site approval with, and upon approval from, the county or regional solid waste authority for the county or counties in which the facility is proposed....; and

(3) File an application for approval of operation as a Class A facility with, and obtain approval from, the county commission for each county in which the facility would be located.... The county commission shall hold at least one public hearing and shall solicit public comment prior to acting on the application. The county commission shall provide notice of such public hearing with publication of a Class II legal advertisement in a qualified newspaper serving the county where the proposed site is situated.

(b) If applications are approved pursuant to subdivisions (1), (2) and (3), subsection (a) of this section, each county commission shall order that a referendum be placed upon the ballot....

(1) Such referendum will be to determine whether it is the will of the voters of the county that a Class A facility be located in the county....

(3) If a majority of the legal votes cast upon the question be against the siting of a Class A facility within the county, then the county commission, the county or regional solid waste authority and the division of natural resources shall not proceed any further with the application. If a majority of the legal votes cast upon the question be for siting a Class A facility within the county, then the application process ... may proceed: *Provided,* That such vote shall not be binding on or require the division of natural resources to issue a permit....

(c) ... [T]he public referendum established in this section shall be mandatory for every new Class A facility applicant which will accept between ten and thirty thousand tons of solid waste per month....

3. W.Va.Code § 20–9–12d (enacted by S.B. 18, repealed and reenacted with technical amendments by Acts 1994 in W.Va.Code § 22C–4–27) which provides in pertinent part:

(a) ... [I]n order to obtain approval to operate as a Class A facility at a site previously permitted to operate as a Class B facility, an applicant shall:

(1) File an application for a certificate of need with, and obtain approval from, the public service commission....;

(2) File an application for a certificate of site approval with, and obtain approval from, the county or regional solid waste authority for the county or counties in which the facility is located or proposed....; and

(3) File an application for approval of operation as a Class A facility with, and obtain approval from, the county commission for each county in which the facility is or would be located.... The county commission shall hold at least one public hearing and shall solicit public comment prior to acting on the application. The county commission shall provide notice of such public hearing with publication of a Class II legal advertisement in a qualified newspaper serving the county where the proposed site is situated.

(b) If applications are approved pursuant to subdivisions (1), (2) and (3), subsection (a) of this section, the county or regional solid waste authority shall publish a Class II legal advertisement ... in a newspaper of general circulation in the counties wherein the solid waste facility is located. Upon the written petition of registered voters residing in the county equal to not less than fifteen percent of the number of votes cast within the county for governor at the preceding gubernatorial election ... the county commission shall ... order a referendum be placed upon the ballot. Any referendum conducted pursuant to this section shall be held at the next primary, general or other countywide election.

(1) Such referendum will be to determine whether it is the will of the voters of the county that the Class B facility be converted to a Class A facility. . . .

(3) If a majority of the legal votes cast upon the question be against the facility, then the county commission, the county or regional solid waste authority and the division of natural resources shall not proceed any further with the application. If a majority of the legal votes cast upon the question be for the facility, then the application process . . . may proceed: *Provided,* That such vote is not binding on or require the division of natural resources to modify the permit. . . .

4. W.Va.Code § 20–9–12e (enacted by S.B. 18, repealed and reenacted with technical amendments by Acts 1994 in W.Va.Code § 22C–4–28) which provides in pertinent part:

(a) . . . [I]n order to increase the maximum allowable monthly tonnage handled by a Class A facility by an aggregate amount of more than ten percent of the facility's permit tonnage limitation within a two-year period, the permittee shall:

(1) File an application for approval with, obtain approval from, the county or regional solid waste authority for the county or counties in which the facility is located. . . .;

(2) File an application for approval with, obtain approval from, the public service commission to modify the certificate of need . . .; and

(3) File an application for a major permit modification with the division of natural resources.

(b) If applications are approved pursuant to subdivisions (1) and (2), subsection (a) of this section and an application has been filed pursuant to subdivision (3), subsection (a) of this section, the county or regional solid waste authority shall publish a Class II legal advertisement . . . in a newspaper of general circulation in the counties wherein the solid waste facility is located. Upon the written petition of registered voters residing in the county equal to not less than fifteen percent of the number of votes cast within the county for governor

at the preceding gubernatorial election . . . the county commission shall . . . order a referendum be placed upon the ballot. . . .

(1) Such referendum will be to determine whether it is the will of the voters in the county that the Class A facility applicant be permitted to increase the maximum tonnage allowed to be handled at the facility not to exceed thirty thousand tons per month. . . .

(3) If a majority of the legal votes cast upon the question be against allowing the Class A facility to increase the maximum tonnage of solid waste allowed to be handled per month at the facility, then the division of natural resources shall not proceed to modify the Class A facility permit to increase the maximum allowable tonnage. If a majority of the legal votes cast upon the question be for allowing the Class A facility to increase the maximum tonnage of solid waste allowed to be handled per month at such facility, then the application process . . . may proceed: *Provided,* That such vote shall not be binding on or require the county or regional solid waste authority or the division of natural resources to approve an application to modify the permit. . . .

f. *Tonnage Caps*

1. W.Va.Code § 20–5F–4c (enacted by S.B. 18, repealed and reenacted by Acts 1994 at W.Va.Code § 22–15–8) which provides in pertinent part:

[I]t shall be unlawful to operate any commercial solid waste facility that handles between ten thousand and thirty thousand tons of solid waste per month [without proper approval]. . . . [T]he maximum quantity of solid waste which may lawfully be handled at any commercial solid waste facility shall be thirty thousand tons per month.

2. W.Va.Code § 20–9–2(c) and (d) (enacted by S.B. 18, repealed and reenacted by Acts 1994 at § 22C–4–2(d) and (e)) which provides in pertinent part:

(c) "Class A facility" means a commercial solid waste facility which handles an aggre-

gate of between ten and thirty thousand tons of solid waste per month. . . .

(d) "Class B facility" means a commercial solid waste facility which receives or is expected to receive [no more than] ten thousand tons [of solid waste] per month.

### g. *Solid Waste Assessments Applicable to Sewage Sludge*

W.Va.Code § 20–5F–2b(e) (enacted by S.B. 288, repealed and reenacted with technical amendments by Acts 1994 at W.Va.Code § 22–15–20(e)) which provides in pertinent part:

All sewage sludge placed in, or upon, or used by a solid waste facility or processed or handled, pursuant to a permit issued by the division of environmental protection, shall be subject to the same tipping and other fees levied by this chapter on the disposal of solid waste and shall be included in said facility's total tonnage. . . . [N]o such fees . . . shall be levied upon the application of sewage sludge to land outside a solid waste facility. . . .

### h. *Siting Plans*

W.Va.Code § 20–9–12a (enacted by S.B. 18, repealed and reenacted with technical amendments by Acts 1994 at W.Va.Code § 22C–4–24) provides in pertinent part:

(a) . . . [E]ach county or regional solid waste authority shall prepare and complete a commercial solid waste facilities siting plan for the county or counties within its jurisdiction [.] . . . The siting plan shall identify zones within each county where siting of the following facilities is authorized or prohibited:

(1) Commercial solid waste facilities which may accept an aggregate of more than ten thousand tons of solid waste per month.

(2) Commercial solid waste facilities which shall accept only less than an aggregate of ten thousand tons of solid waste per month.

(3) Commercial solid waste transfer stations or commercial facilities for the processing or recycling of solid waste.

(b) The county or regional solid waste authority shall develop the siting plan authorized by this section based upon the consideration of one or more of the following criteria: The efficient disposal of solid waste, including all solid waste generated within the county or region, economic development, transportation facilities, property values, groundwater and surface waters, geological and hydrological conditions, aesthetic and environmental quality, historic and cultural resources, the present or potential land uses for residential, commercial, recreational, environmental conservation or industrial purposes and the public health, welfare and convenience. . . .

(e) Effective upon approval of the siting plan by the solid waste management board, it shall be unlawful for any person to establish, construct, install or operate a commercial solid waste facility at a site not authorized by the siting plan: *Provided,* That an existing commercial solid waste facility which, on the eighth day of April, one thousand nine hundred eighty-nine, held a valid solid waste permit or compliance order issued by the division of natural resources pursuant to article five-f of this section may continue to operate but may not expand the spatial land area of the said facility beyond that authorized by said solid waste permit or compliance order, and may not increase the aggregate monthly solid waste capacity in excess of ten thousand tons monthly unless such a facility is authorized by the siting plan. . . .

(g) Notwithstanding any provision of this code to the contrary, upon application . . . the county or regional solid waste authority or county commission, as appropriate, may amend the siting plan by redesignating a zone that has been designated as an area where a commercial solid waste facility is tentatively prohibited to an area where one is authorized. In such case, the person seeking the change has the burden to affirmatively and clearly demonstrate, based on the criteria set forth in subsection (b) of this section, that a solid waste facility could be appropriately operated in the public interest at such location. . . .

7. The legislative purposes and findings relevant to the challenged statutes include the following:

a. W.Va.Code § 20–5F–1 (enacted by S.B. 18, repealed and reenacted by Acts 1993 and Acts 1994 at W.Va.Code § 22–15–1 [5]) provides in pertinent part:

(a) The purpose of this article is to ... establish a comprehensive program of controlling solid waste disposal.

(b) The Legislature finds that uncontrolled, inadequately controlled and improper collection, transportation, processing and disposal of solid waste: (1) Is a public nuisance and a clear and present danger to people; (2) provides harborage and breeding places for disease-carrying, injurious insects, rodents and other pests harmful to the public health, safety and welfare; (3) constitutes a danger to livestock and domestic animals; (4) decreases the value of private and public property, causes pollution, blight and deterioration of the natural beauty and resources of the state and has adverse economic and social effects on the state and its citizens; (5) results in the squandering of valuable nonrenewable and nonreplenishable resources contained in solid waste; (6) that materials recovery and recycling reduces the need for landfills and extends their life; and that (7) proper disposal, materials recovery or recycling of solid waste is for the general welfare of the citizens of this state.

(c) The Legislature further finds that disposal in West Virginia of solid waste of unknown composition threatens the environment and the public health, safety and welfare, and therefore, it is in the interest of the public to identify the type, amount and origin of solid waste accepted for disposal at West Virginia solid waste facilities;

(d) The Legislature further finds that other states of these United States of America have imposed stringent standards for the proper collection and disposal of solid waste and that the relative lack of such standards and enforcement for such activities in West Virginia has resulted in the importation and disposal in the state of increasingly large amounts of infectious, dangerous and undesirable solid wastes and hazardous waste from other states by persons and firms who wish to avoid the costs and requirements for proper, effective and safe disposal of such wastes in the states of origin.

(e) The Legislature further finds that Class A facilities often have capacities far exceeding the needs of the state or the areas of the state which they serve and that such landfills create special environmental problems that require statewide coordination of the management of such landfills.

b. W.Va.Code § 20–9–1 (repealed and reenacted by Acts 1993 and Acts 1994 at W.Va. Code § 22C–4–1), provides in pertinent part:

The Legislature finds that the improper and uncontrolled collection, transportation, processing and disposal of domestic and commercial garbage, refuse and other solid wastes in the state of West Virginia results in: (1) A public nuisance and a clear and present danger to the citizens of West Virginia; (2) the degradation of the state's environmental quality including both surface and groundwaters which provide essential and irreplaceable sources of domestic and industrial water supplies; (3) provides harborages and breeding places for disease-carrying, injurious insects, rodents and other pests injurious to the public health, safety and welfare; (4) decreases public and private property values and results in the blight and deterioration of the natural beauty of the state; (5) has adverse social and economic effects on the state and its citizens; and (6) results in the waste and squandering of valuable nonrenewable resources contained in such solid wastes which can be recovered through proper recycling and resource-recovery techniques with great social and economic benefits for the state.

The Legislature further finds that the proper collection, transportation, process-

---

**5.** W.Va.Code § 22–15–1 includes the following relevant changes: in subsection (c), "unknown composition" is changed to "unknown origins" and in subsection (d), "in the states of origin" has been deleted from the statute.

ing, recycling and disposal of solid waste is for the general welfare of the citizens of the state and that the lack of proper and effective solid waste collection services and disposal facilities demands that the state of West Virginia and its political subdivisions act promptly to secure such services and facilities in both the public and private sectors.

The Legislature further finds that other states of these United States of America have imposed stringent standards for the proper collection and disposal of solid waste and that the relative lack of such standards and enforcement for such activities in West Virginia has resulted in the importation and disposal into the state of increasingly large amounts of infectious, dangerous and undesirable solid waste and hazardous waste from other states by persons and firms who wish to avoid the costs and requirements for proper, effective and safe disposal of such wastes in the states of origin.

The Legislature further finds that the process of developing rational and sound solid waste plans at the county or regional level is impeded by the proliferation of siting proposals for new solid waste facilities.

Therefore, it is the purpose of the Legislature to protect the public health and welfare by providing for a comprehensive program of solid waste collection, processing, recycling and disposal to be implemented by state and local government in cooperation with the private sector. The Legislature intends to accomplish this goal by establishing county and regional solid waste authorities throughout the state to develop and implement litter and solid waste control plans. It is the further purpose of the Legislature to restrict and regulate persons and firms from exploiting and endangering the public health and welfare of the state by disposing of solid waste and other dangerous materials which would not be accepted for disposal in the location where such wastes or materials were generated.

It is further the purpose of the Legislature to reduce our solid waste management problems and to meet the purposes of this article by requiring county and regional solid waste authorities to establish programs and plans based on an integrated waste management hierarchy. In order of preference, the hierarchy is as follows:

(1) *Source reduction.*—This involves minimizing waste production and generation through product design, reduction of toxic constituents of solid waste and similar activities.

(2) *Recycling, reuse and materials recovery.*—This involves separating and recovering valuable materials from the waste stream, composting food and yard waste, and marketing of recyclables.

(3) *Landfilling.*—To the maximum extent possible, this option should be reversed for nonrecyclables and other materials that cannot practically be managed in any other way. This is the lowest priority in the hierarchy and involves the waste management option of last resort.

The Legislature further finds that the potential impacts of proposed commercial solid waste facilities may have a deleterious and debilitating impact upon the transportation network, property values, economic growth, environmental quality, other land uses and the public health and welfare in affected communities. The Legislature also finds that the siting of such facilities is not being adequately addressed to protect these compelling interests of counties and local communities.

The Legislature further finds that affected citizens and local governments often look to state environmental regulatory agencies to resolve local land use conflicts engendered by those proposed facilities. The Legislature also finds that such local land use conflicts are most effectively resolved in a local governmental forum where citizens can most easily participate in the decision-making process and the land use values of local communities most effectively identified and incorporated into a comprehensive policy which reflects the values and goals of those communities.

Therefore, it is the purpose of the Legislature to enable local citizens to resolve the land-use conflicts which may be created by

proposed commercial solid waste facilities through the existing forum of county or regional solid waste authorities.

8. Publicly owned treatment works ("POTWs") are not required to pay the assessment fees imposed upon commercial sewage sludge composting facilities by W.Va. Code § 20–5F–2b(e) (now § 22–15–20(e)) by virtue of a provision that excludes from the definition of "composting facility" those facilities which compost solid waste "that is located at the site where the waste was generated." W.Va.Code § 20–5F–2(y) (now § 22–15–2(10)).

### V. *Rule 12(b)(6) Standards*

■ In assessing a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), the court must accept the factual allegations contained in the complaint as true. *Advanced Health–Care Servs., Inc. v. Radford Community Hosp.,* 910 F.2d 139, 143 (4th Cir.1990). Dismissal is appropriate pursuant to Rule 12(b)(6) only if " 'it appears to be a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proven in support of its claim.' " *Id.* at 143–44 (quoting *Johnson v. Mueller,* 415 F.2d 354, 355 (4th Cir.1969)); *see also Rogers v. Jefferson–Pilot Life Ins. Co.,* 883 F.2d 324 (4th Cir.1989).

Stated another way, it has often been said that the purpose of a motion under Rule 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief; it is not a procedure for resolving a contest about the facts or the merits of the case. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1356 (1990). The Rule 12(b)(6) motion also must be distinguished from a motion for summary judgment under Fed.R.Civ.P. 56, which goes to the merits of the claim and is designed to test whether there is a genuine issue of material fact. For purposes of the motion to dismiss, the complaint is construed in the light most favorable to the party making the claim and essentially the court's inquiry is directed to whether the allegations constitute a statement of a claim under Fed.R.Civ.P. 8(a).

■ A motion to dismiss for failure to state a claim under Rule 12(b)(6) should be granted only in very limited circumstances. *Rogers,* 883 F.2d at 325. A dismissal under Rule 12(b)(6) is granted only in cases in which the allegations raised in the complaint clearly demonstrate that plaintiff does not have a claim and that no set of facts would support plaintiff's claim. 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil* § 1357 (1990).

■ Finally, "[a] district court's dismissal under Rule 12(b)(6) is, of course, with prejudice unless it specifically orders dismissal without prejudice. That determination is within the district court's discretion." *Carter v. Norfolk Community Hosp. Ass'n, Inc.,* 761 F.2d 970, 974 (4th Cir.1985).

### VI. *Summary Judgment Standards*

■ Under Fed.R.Civ.P. 56(c), summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, as the United States Supreme Court noted in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), Rule 56(c) itself provides that "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but must set forth specific facts showing that there is a genuine issue for trial." "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. *See also Charbonnages de France v. Smith,* 597 F.2d 406, 414 (4th Cir.1979) (finding that summary judgment " 'should be granted only where it is perfectly clear that no issue of fact is

**744**

involved and inquiry into the facts is not desirable to clarify the application of the law.'") (quoting *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir.1950)).

▆▆ In *Celotex*, the Supreme Court stated that the "plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322, 106 S.Ct. 2548. Summary judgment is not appropriate until after the non-moving party has had sufficient opportunity for discovery. *Oksanen v. Page Mem'l Hosp.*, 912 F.2d 73, 78 (4th Cir.1990). In reviewing the supported underlying facts, all inferences must be viewed in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

### VII. *Motion of the Secretary of Tax and Revenue to Dismiss Count I.A(1) of the Complaint*

Count I.A(1) of the complaint alleges that three provisions of S.B. 18, now repealed, unconstitutionally imposed differentiated solid waste assessment fees upon out-of-state solid waste landfilled in West Virginia. The complaint further alleges that plaintiffs paid over $1.5 million in differentiated fees while the provisions were in force. In their motion for permanent injunction and declaratory relief, plaintiffs seek to recover those monies paid to the state under the repealed statutes. Defendant Secretary of Tax and Revenue asserts that this Court lacks jurisdiction over this claim because the Eleventh Amendment of the United States Constitution bars this Court from exercising jurisdiction over a claim by a private citizen against a state for retroactive monetary relief. This Court agrees that count I.A(1) should be dismissed for failure to state a claim upon which relief can be granted.

Defendant Secretary's motion to dismiss raises questions of jurisdiction, mootness and proper pleading under Rule 8(a) of the Federal Rules of Civil Procedure. First, this Court notes that, as the Secretary stated in his motion, the complaint in this matter does not contain a prayer for retroactive monetary relief with regard to the repealed assessment statutes. Fed.R.Civ.P. 8(a) requires that a complaint contain "a demand for judgment for the relief the pleader seeks." While the complaint alludes to a demand for retroactive monetary relief, no such demand is directly stated in the complaint, even though such a demand is made in subsequent pleadings. Accordingly, plaintiffs should be barred from asserting claims not properly pleaded in the complaint, and are not entitled to seek retroactive monetary relief at this time.

▆▆ In the alternative, however, this Court finds that even if a demand for retroactive monetary relief were properly made in the complaint, plaintiffs are still barred from recovering retroactive monetary relief by the Eleventh Amendment. "Because of the Eleventh Amendment, States may not be sued in federal court unless they consent to it in unequivocal terms or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity." *Green v. Mansour*, 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371, 68 (1985). While federal courts are not prevented by the Eleventh Amendment from granting prospective relief and crafting remedies designed to end a continuing constitutional violation, the doctrine of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), bars claims for retrospective relief against the state from federal court.

▆▆ Nonetheless, an award of retroactive monetary relief is proper if it is ancillary to prospective relief. *Association of Surrogates and Supr. Ct. Reporters within New York v. New York*, 940 F.2d 766, 774 (2d Cir.1991). Thus, where the court enjoined the State of New York from enforcing a "lag-payroll" law, the ancillary effect on the state treasury as a result of the prospective relief was " 'a permissible and ... inevitable consequence' " and was not barred by the Eleventh Amendment. *Id.* (citations omitted); *see also Native Village of Venetie I.R.A. Council v. Alaska*, 944 F.2d 548, 552 (9th Cir.1991) (explaining that if retroactive mon-

etary relief is "ancillary" to prospective relief, it is not barred by the Eleventh Amendment).

The Eleventh Amendment also bars declaratory relief that has "the same effect as a full-fledged award of damages or restitution by the federal court...." *Green*, 474 U.S. at 73, 106 S.Ct. 423. In *Green*, the plaintiffs alleged that the state had improperly calculated plaintiffs' benefits under the Federal Aid to Families with Dependent Children program. *Id.* at 65–66, 106 S.Ct. 423. Plaintiffs sought to enjoin the state from making further erroneous calculations and further sought a declaration that the state violated federal law in making the past computations. *Id.* During the pendency of the litigation, Congress amended the relevant statutory provisions thereby mooting any injunctive relief that could be awarded to plaintiffs. *Id.* at 65, 106 S.Ct. 423. However, plaintiffs argued that they could properly be granted the declaratory relief that they sought. *Id.*

The Supreme Court found that granting relief under the Declaratory Judgment Act was within a court's discretion and was dependent upon equitable considerations. *Id.* at 72, 106 S.Ct. 423. Specifically, the court held that a declaratory judgment is not appropriate where there is no continuing violation of federal law, where there is no "threat of state officials violating the repealed law in the future[,]" and where the sole purpose of the declaratory judgment would be to have a res judicata effect in subsequent state proceedings. *Id.* at 72–73, 106 S.Ct. 423. Thus, the Court found that declaratory judgment was inappropriate because there was no continuing violation of federal law and that any declaratory relief would result in an " 'end run' " around the jurisdictional limitations of the Eleventh Amendment. *Id.* at 73, 106 S.Ct. 423; *see also Manning v. S.C. Dept. of Highway and Pub. Transp.*, 914 F.2d 44, 48 (4th Cir.1990) (holding that Eleventh Amendment prohibited declaratory relief where only benefit plaintiff could derive from declaration that outmoded statutory scheme violated his constitutional rights was res judicata effect in state court proceedings).

As noted above, the Eleventh Amendment permits a court to grant prospective relief to a private party against a state for continuing violations of federal law. However, a question of mootness of the prospective relief arises when the state voluntarily ceases a challenged practice. In *Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982), the Supreme Court held that "voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of a practice." At the same time, the Court noted that a "case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not be reasonably expected to recur...." *Id.* at n. 10, 102 S.Ct. 1070; *see also Green*, 474 U.S. at 72, 106 S.Ct. at 428 (claim for injunctive relief mooted where there is no threat of state officials violating repealed law in the future).

This Court finds that the Eleventh Amendment bars this Court from awarding plaintiffs retroactive monetary relief or declaratory judgment relief under Count I.A(1) of the complaint. As a preliminary matter, this Court must address plaintiffs' argument that the Eleventh Amendment is inapplicable. First, this Court notes that, although plaintiffs argue otherwise, any retroactive relief in the form of a refund of fees paid by plaintiffs would affect the state treasury and thereby would invoke the prohibitions of the Eleventh Amendment. Although the fees collected under the now-repealed statutes were designated to specific funds, those funds were "state funds" such that if a refund was ordered, the state would be obligated to pay such refund. Additionally, W.Va. Code § 12–2–2 indicates that all monies collected under acts of the legislature become part of the state treasury. Accordingly, this Court finds that there is no doubt that the Eleventh Amendment applies to the monies referenced in Count I.A(1).

Plaintiffs also argue that under the Commerce Clause, Congress can abrogate the state's sovereign immunity under the Eleventh Amendment. *See Pennsylvania v. Union Gas Co.*, 491 U.S. 1, 109 S.Ct. 2273, 105 L.Ed.2d 1 (1989). However, in *Seminole*

*Tribe of Fla. v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 1128, 134 L.Ed.2d 252 (1996), the Supreme Court expressly overruled its holding in *Union Gas* and held that Congress lacks authority under the Commerce Clause to override the prohibitions of the Eleventh Amendment. Accordingly, this Court finds plaintiffs' argument on this point without merit.

Having decided that the Eleventh Amendment applies in this matter, this Court finds that the Eleventh Amendment bars the retroactive monetary relief sought by plaintiffs. While the state may have an obligation under the Due Process Clause of the Fourteenth Amendment of the United States Constitution to provide "meaningful backward looking relief to rectify any unconstitutional deprivation," *McKesson Corp. v. Division of Alcoholic Beverages and Tobacco,* 496 U.S. 18, 31, 110 S.Ct. 2238, 110 L.Ed.2d 17 (1990), this Court is without jurisdiction to order the state to do so.

Furthermore, neither of the exceptions to the Eleventh Amendment constraint permit this Court to grant plaintiffs the relief they seek. First, the retroactive relief sought by plaintiffs cannot be ancillary to any prospective relief that could be awarded by this Court. Here, the statutes challenged in I.A(1) of the complaint, unlike those challenged in *Mesquite,* were repealed prior to this lawsuit. The complaint makes no allegation that there is any reasonable risk that defendant Secretary will reenact the statutes and engage in any kind of "continuing violation" of federal law. Thus, this Court finds there is no reason for the court to enjoin the possible reenactment of a potentially unconstitutional statute. Accordingly, this Court will exercise its discretion under the Declaratory Injunction Act and will not enjoin the possible reenactment of a potentially uncon-

stitutional statute. Thus, because the issue of prospective relief is mooted by the statutes' repeal, any retroactive relief that could be awarded under Count I.A(1) cannot be ancillary to a prospective remedy; it is barred by the Eleventh Amendment.

Second, this Court finds that any declaratory judgment that it might make regarding the constitutionality of the repealed statutes would do no more than have a *res judicata* effect on any state proceedings brought by plaintiffs to obtain a refund of the fees paid. Clearly, case law establishes the Supreme Court's disfavor of declaratory judgments which permit a plaintiff to avoid the constraints of the Eleventh Amendment. Accordingly, although this Court indicated in its preliminary injunction orders that it could and would consider the constitutionality of the repealed statutes, upon further and closer review, this Court finds that it is precluded by the Eleventh Amendment from doing so. Defendant Secretary's motion to dismiss Count I.A(1) for failure to state a claim upon which relief can be granted is GRANTED,[6] and this Court makes no determination as to the constitutionality of the now-repealed differential fee statutes.[7]

VIII.    *Defendant Public Service Commission's Motion to Modify Orders to Remove Public Service Commission from Enjoined Defendants; Defendant Public Service Commission's Motion for Judgment on the Pleadings re: Lack of Jurisdiction; and Motion of Plaintiffs to Substitute Real Party in Interest or Dismiss Public Service Commission*

▆▆▆▆    Defendant Public Service Commission ("PSC") asserts that this Court lacks subject matter jurisdiction over the claims against it because the Eleventh Amendment bars the plaintiffs from filing suit against a

---

**6.** As noted in previous opinions in this case, this Court's ruling does not leave plaintiffs without a remedy concerning fees paid under the now repealed statutes. The West Virginia legislature has expressly applied its tax code to the statutes in question. Pursuant to the West Virginia Tax Procedure and Administration Act, a taxpayer may request a refund from an unconstitutional tax, or in this case, a fee, from the West Virginia Tax Commissioner and may appeal that decision if necessary. *See* W.Va.Code § 11–10–14. Thus,

this Court believes that plaintiffs can pursue their claims through the state court tax refund system.

**7.** In its decision of September 28, 1995, this Court held that "the state must adhere to this Court's decision concerning the unconstitutionality of the statute and must provide adequate relief to the plaintiffs...." (Order, 9/28/95, p. 16–17). This holding was in error and is hereby VACATED in light of the above discussion.

state agency for prospective relief.[8] This Court agrees. In *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993), the Supreme Court held that the doctrine of *Ex Parte Young* permits private plaintiffs to bring actions for prospective relief against state officials. However, challenging the constitutionality of official conduct does not permit a private plaintiff to sue a state or its agency for prospective relief. *Id.* Based upon the holding in *Puerto Rico Aqueduct*, this Court finds that the Eleventh Amendment bars plaintiffs' claims against the PSC. Plaintiffs have not named individual PSC officials as defendants. Rather, the agency itself is the named defendant. Accordingly, PSC's motions to modify this Court's September 28, 1995 and December 14, 1995 orders and for summary judgment on the pleadings is GRANTED. It is further ORDERED that PSC is removed from the defendants enjoined by this Court's orders of September 28, 1995 and December 14, 1995 and is DISMISSED as a defendant from the above-captioned case. It is further OR-DERED that all allegations and claims relating to the Commission are DISMISSED from the complaint.[9]

Plaintiffs appear to agree that the dismissal of PSC is proper, but request that this Court substitute the individual commissioners of the PSC as the real parties in interest in this action. This Court finds that such a substitution at this time would be improper. The existence of subject matter jurisdiction is based upon facts that existed at the time the complaint was filed. *New Bank v. Tritek Comm., Inc.*, 143 F.R.D. 13, 16 (D.Mass.1992). Jurisdiction cannot be created retroactively. Thus, the court in *Tritek* held that it did not have jurisdiction to hear a motion to substitute a party to create federal question subject matter jurisdiction where the court lacked jurisdiction from the outset. *Id.*

Similarly, this Court finds that it cannot order the substitution of the individual commissioners of PSC to create jurisdiction where none heretofore existed. Accordingly, plaintiffs motion to substitute real party in interest or, in the alternative, to dismiss the defendant public service commission from this action is GRANTED IN PART and DENIED IN PART. The PSC, as stated above, is dismissed from this action and the individual commissioners will not be substituted as parties in its place.

IX. *Motion of the Public Service Commission for Summary Judgment on the Constitutionality of West Virginia's Certificate of Need Statute, of West Virginia's Legislatively–Established Tonnage Caps and of the Commission's Independent Statutory Authority to Impose Tonnage Caps*

Because this Court has dismissed the PSC as a party to this action and does not have jurisdiction over the PSC, the PSC's motion for summary judgment on the constitutionality of the certificate of need statute, of legislatively established tonnage caps and of the Commission's independent statutory authority to impose tonnage caps is DENIED AS MOOT.

X. *Motion of the Attorney General and the Secretary of Tax and Revenue to Abstain*

Defendants Attorney General and Secretary of Tax and Revenue argue that this Court should abstain from deciding the constitutionality of the challenged statutes under the *Burford, Pullman, Colorado River* and *Younger* abstention doctrines. *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *Railroad Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *Colorado River Water Conserv. Dist. v. United States*, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) and *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). Defendants assert

8. Eleventh Amendment jurisdictional challenges can be raised at any time during the pendency of a case. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 n. 8, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

9. This Court declines to dismiss all claims relating to Chapter 24 of the West Virginia Code and declines to award costs to the PSC for defending this litigation.

that because there are actions currently pending before state tribunals and administrative bodies that were instituted before this action was filed, because those state matters address issues common to this matter and address state law issues that allegedly moot certain disputes in this action and because those matters involve the administration of a complex regulatory scheme, this Court should defer to the decisions of the state court and dismiss this action. After reviewing the abstention doctrines relied on by defendants, this Court finds that it will not abstain from deciding whether the statutes challenged by plaintiffs are unconstitutional.

In *Burford,* the Supreme Court held that when an issue "clearly involves basic problems of [state] policy [,] ... equitable discretion should be exercised to give the [state] courts the first opportunity to consider them." 319 U.S. at 332, 63 S.Ct. 1098. The Court further clarified the controlling principles of *Burford* in *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989):

> [W]here timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in a case then at bar"; or (2) where the "exercise of federal review of a question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern."

(citation omitted).

While a state's attempts to establish a coherent policy regarding a matter of public importance is a relevant *Burford* consideration, it has been held that "[t]he state has no right to an unconstitutional policy, coherent or otherwise." *Allstate Ins. Co. v. Sabbagh,* 603 F.2d 228, 232 (1st Cir.1979); *see also Fireman's Fund Ins. Co. v. Quackenbush,* 87 F.3d 290, 297 (9th Cir.1996).

■ Abstention is appropriate under *Pullman* when the resolution of a federal constitutional question might be obviated if the state courts were given the opportunity to interpret ambiguous state law. In other words, if the constitutional issue arises only if the state law is interpreted in a particular way and the state courts have not had the opportunity to construe the statute, federal courts may, at their discretion, abstain from deciding the constitutional question. *Pullman* abstention has been held to be improper where the issue of state law is relatively clear or where it is unlikely that the state statute can be interpreted so as to avoid the constitutional issue. *Baggett v. Bullitt,* 377 U.S. 360, 375–77, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).

■ Abstention under *Colorado River* is appropriate only when "exceptional circumstances" are present. *O'Neill v. United States,* 50 F.3d 677, 688 (9th Cir.1995), *cert. denied,* 516 U.S. 1028, 116 S.Ct. 672, 133 L.Ed.2d 521 (1995). In the interest of "wise judicial administration," federal courts may stay a case involving a question of federal law where a concurrent state action is pending in which the identical issues are raised. *Colorado River,* 424 U.S. at 817–18, 96 S.Ct. 1236. Relevant factors to be considered under the *Colorado River* doctrine include whether the state and federal suits are substantially similar, *Nakash v. Marciano,* 882 F.2d 1411, 1416 (9th Cir.1989); the inconvenience of the federal forum; the forum in which jurisdiction was first obtained, *Colorado River,* 424 U.S. at 818, 96 S.Ct. 1236; whether state or federal law provides the rule of the decision on the merits, *Youell v. Exxon Corp.,* 74 F.3d 373, 375 (2d Cir.1996); and the risk of conflicting results, *Colorado River,* 424 U.S. at 818, 96 S.Ct. 1236. "[T]he presence of state law issues ... is not generally a valid justification for granting a stay under the *Colorado River* doctrine." *Intel Corp. v. Advanced Micro Devices, Inc.,* 12 F.3d 908, 915 (9th Cir.1993).

■ Abstention under *Younger* mandates that, absent exceptional circumstances, federal courts may not enjoin or otherwise interfere with certain types of state proceedings on constitutional grounds. Federal courts must abstain where state court proceedings are pending when the federal action

is filed, those proceedings implicate important state interests, and they provide an adequate opportunity to raise the federal claims. *Middlesex County Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982). *Younger* abstention principles do not require federal courts to forego the exercise of their jurisdiction to decide a federal constitutional question under the Declaratory Judgment Act whenever a state prefers to litigate the question of declaratory relief in state court. *Polykoff v. Collins,* 816 F.2d 1326, 1333 (9th Cir.1987).

Defendants Attorney General and Secretary of Tax and Revenue cite other court decisions that hold that *Burford* abstention was appropriate in similar circumstances and assert that this Court should likewise exercise its discretion to abstain under *Burford.* Specifically, defendants argue that *Burford* abstention is appropriate because this action involves a complex and comprehensive local regulatory scheme. *See e.g. Browning-Ferris, Inc. v. Baltimore County, Md.,* 774 F.2d 77 (4th Cir.1985) (applying *Burford* abstention doctrine in context of solid waste regulation). This Court disagrees, however, that *Burford* abstention must be invoked here.

Defendants allege that there are five state court proceedings, all instituted prior to this action, which challenge the application of tonnage caps and solid waste fees to sewage sludge pursuant to W.Va.Code § 20–5F–2b(e) (now codified at W.Va.Code § 22–15–20(e)). In at least some of those cases, plaintiffs argue the fees and tonnage caps are improperly applied because the sewage sludge is processed by a separate facility that is not part of plaintiffs' landfill operations. Defendants assert that because the pending state matters involve complex solid waste regulations, this Court should abstain from deciding the constitutionality of the statutes imposing tonnage caps and fees on sewage sludge.

This Court agrees with the Fourth Circuit that "land use questions, especially those that involve the regulation of trash dumps, are the peculiar concern of local and state governments, and traditionally, federal courts have not interfered with state courts in the area of land use policy." *Browning-Ferris,* 774 F.2d at 79. In *Browning-Ferris,* the court affirmed the district court's decision to abstain, under *Burford,* from ruling upon the plaintiffs' constitutional challenge to state landfill regulations because state court proceedings involving the interpretation of those statutes were pending. *Id.* at 80. However, this Court finds the facts of this case distinguishable from the facts of *Browning-Ferris.*

■ In *Browning-Ferris,* the Fourth Circuit noted that if the federal court had proceeded to hear the case it would "be required to decide if [the plaintiff] was eligible for a permit [under the statutes].... Requirements for the continued operation of the landfill, including the type of waste to be transported, the times of operation, and the need for environmental controls, would have to be decided by the district court.... [T]he federal court of necessity would become involved in the complexities of state land use control." *Id.* To the contrary, this Court does not need to become involved in the complexities of the sewage sludge statute or Solid Waste Management Act to determine whether those statutes are constitutional. This Court will not have to decide how the statute applies to plaintiffs in order to determine its constitutionality. Further, as noted above, even if the decision of this Court interferes with the application of a coherent public policy, abstention is not warranted because the state does not have a right to administer an unconstitutional policy. Accordingly, this Court will not abstain under the *Burford* doctrine.

■ With regard to abstention under the *Pullman* doctrine, this Court also declines to abstain. This Court finds that this Court's decision on whether the challenged statutes are unconstitutional is not dependent upon any interpretation of the statute that could result from the state proceedings. Defendants allege that because plaintiffs have raised defenses concerning the application of the tonnage caps and fees to sewage sludge, the decisions of the state courts and administrative bodies on the issue may moot the constitutional question presented to this Court. This Court, however, cannot envision

how any interpretation of the statute's application will moot the question as to its constitutionality. Accordingly, this Court declines to exercise its discretion to abstain under the *Pullman* doctrine.

■ Similarly, this Court will not abstain under the *Colorado River* doctrine. First and foremost, this Court finds that there are no state court proceedings involving questions identical to those raised in this civil action. No state court proceeding cited by defendants involves the constitutionality of the challenged statutes. Thus, on that ground alone, *Colorado River* abstention is inappropriate.

Additionally, an application of the *Colorado River* factors indicates that this Court should not abstain. Here, federal law rather than state law will provide the rule of decision on the merits. Further, because there is no state court proceeding involving the constitutionality question, no risk of inconsistent judgments exists. In summary, this Court finds that there are no "exceptional circumstances" present which persuade this Court to abstain under the *Colorado River* doctrine.

■ Finally, this Court finds that the *Younger* abstention doctrine does not mandate abstention. In order for *Younger* abstention to apply, the state proceedings must provide an adequate opportunity to raise federal questions. However, this Court finds that none of the state court proceedings cited by defendants appear to include a constitutional challenge. Further, as noted in the *Polykoff* decision, *Younger* abstention principles do not require federal courts to forego exercise of their jurisdiction to decide federal constitutional questions under the Declaratory Judgment Act whenever the state prefers to litigate questions of declaratory relief in state court. 816 F.2d at 1333. Accordingly, this Court finds that it is not required to abstain under the *Younger* doctrine.

For the above reasons, defendants' motion to abstain is DENIED.

**XI.** *Motion of the Secretary of Tax and Revenue for Summary Judgment on all Claims Pertaining to the Constitutionality of the State's Solid Waste Disposal Taxes*

Defendant Secretary of Tax and Revenue has filed a motion for summary judgment, which is in essence a motion requesting that this Court reconsider its earlier ruling that the solid waste disposal fees challenged in this action are "taxes" and not "fees." Defendant Secretary maintains that additional information submitted by the Secretary with his motion establishes that the solid waste assessments are in fact taxes, and therefore, plaintiffs' claims are barred by the Tax Injunction Act, 28 U.S.C. § 1341.

In this Court's omnibus order of September 28, 1995, this Court denied the Secretary's motion to dismiss claims related to the solid waste assessment fees based upon his assertion that the Tax Injunction Act barred federal jurisdiction over the claims. In that order, this Court found that the fees imposed were "fees" and not "taxes" because they were imposed by a regulatory agency, were imposed for the benefit of the regulatory agency, were held separately from general state funds, and were collected for the regulatory purpose of discouraging particular conduct by making it more expensive. (Order, 9/28/95, p. 13). Accordingly, this Court found that the Tax Injunction Act did not apply.

Defendant Secretary argues that new evidence establishes that the "overarching purpose" of the fees imposed under W.Va.Code §§ 22–15–11, 22C–4–30, 20–11–5a, and 22–16–4[10] is to fund governmental operations that broadly benefit the public. Citing *San Juan Cellular Tel. Co. v. Public Serv. Comm'n*, 967 F.2d 683 (1st Cir.1992), defendant Secretary argues that the fees are a "tax" because they provide a general benefit to the public and therefore this Court lacks jurisdiction over the claims under the Tax Injunction Act.

10. Although the Secretary does not raise the issue of the repealed differential fee statutes in his motion, this Court finds that, to the extent that this motion could apply to those statutes, the motion is DENIED AS MOOT based upon this Court's granting defendant Secretary's motion to dismiss plaintiffs' claims regarding the repealed statutes.

This Court concedes that this matter poses a close question on the issue of whether the solid waste assessments are "fees" or "taxes." However, this Court is unpersuaded that its earlier ruling was incorrect. Although the fees collected under the challenged statutes may incidentally benefit the public, the main thrust of the fees is to provide funding for regulatory agencies. Defendant himself stated that the funding of the Office of Solid Waste Management and the West Virginia Sold Waste Management Board "is entirely dependent upon the collection of solid waste assessment fees" and that both agencies "cannot execute their statutory mandates without continuing to receive full funding contemplated by the solid waste assessment fees dedicated to their use." (Motion to Abstain, 7/23/96, p. 20). Additionally, defendant Secretary indicates in his motion that a substantial portion of the revenue collected from the fees is used for administration, inspection, enforcement and permitting activities; is used to fund the operations of the Sold Waste Management Board; and is distributed to various agencies for various purposes.

This Court finds that the new information provided by the Secretary does not establish that the solid waste assessments are "taxes" rather than "fees." Accordingly, this Court finds that the Tax Injunction Act does not preclude this Court from considering the constitutionality of the assessments, and the Secretary's motion for summary judgment is DENIED.

XII. *Motion of the Attorney General and the Secretary of Tax and Revenue to Dismiss Complaint on the Basis of Unclean Hands; Motion by the Environmental Defendants for Partial Summary Judgment (to dissolve the preliminary injunction); and Joint Motion of Defendants to Dissolve the Preliminary Injunction Based on Plaintiffs' Misrepresentations of the Facts Upon Which the Preliminary Injunction was Based*

Defendants Attorney General and Secretary of Tax and Revenue allege that the preliminary injunction issued by this Court should be dissolved for the following reasons: (1) that plaintiffs are not beneficially reusing the sewage sludge received at their composting facility in Brooke County; (2) that the composting methods used at the Brooke County facility has led to its characterization as a "public nuisance"; (3) that plaintiffs have misled this Court by suggesting that the plaintiffs' landfills would suffer from financial ruin from the operation of state law; (4) that the plaintiffs have abused the taxation system and have severely impacted upon the agencies charged by state law with insuring the responsible collection and disposition of solid waste; (5) that plaintiffs gave other misleading testimony at the hearing on the preliminary injunction motion and (6) the pendency of this proceeding has brought litigation pending in state tribunals or administration agencies to a halt. The environmental defendants further assert that the plaintiffs misrepresented to this Court at the time the preliminary injunction was granted that the contract with Nassau County, New York did not provide plaintiffs protection from economic harm.

First, this Court finds that the only allegations made by defendants that are relevant to the *Blackwelder* factors that this Court considered in granting the permanent injunction are the allegations that (1) plaintiffs misrepresented the financial harm that they would suffer if the enforcement of the statutes at issue were not enjoined and (2) plaintiffs did not disclose that they were protected from economic harm because their contract with Nassau County, New York for sewage sludge composting relieved plaintiffs of their contractual obligations if there was a change in the law that kept plaintiffs from complying with the contract. All other allegations made by defendants have no bearing upon the *Blackwelder* factors.

However, even if this Court made a finding that plaintiffs misrepresented the scope of their potential financial harm, this Court finds that the preliminary injunction was not erroneously issued. This Court premised its finding that plaintiffs would suffer irreparable harm without injunctive relief not only upon the potential economic harm that might come to plaintiffs but also because

an irreparable harm occurs when an individual is denied a constitutional right. *See Henry v. Greenville Airport Comm'n*, 284 F.2d 631, 633 (4th Cir.1960). Regardless of the economic harm suffered by plaintiffs, it is clear to this Court that any constitutional deprivation results in an irreparable harm. Thus, although this Court agrees with defendants that it could dissolve the preliminary injunction on the basis that plaintiffs have engaged in unconscionable or misleading behavior, this Court finds that plaintiffs' bad behavior, if any, did not impact upon this Court's analysis under the *Blackwelder* factors. Accordingly, this Court DENIES defendant Attorney General and Secretary· of Tax and Revenue's motion to dissolve the preliminary injunction based upon plaintiffs' alleged misrepresentations and bad behavior, and DENIES IN PART the environmental defendants' motion for partial summary judgment.

■■■■■ Defendants Attorney General and Secretary of Tax and Revenue also assert that this Court should dismiss plaintiffs' complaint on the basis of "unclean hands" because (1) plaintiffs have intercepted solid waste closure assistance fees in violation of state law and have attempted to intimidate defendant Secretary of Tax and Revenue by filing a false complaint with this Court; (2) plaintiffs have misled this Court by suggesting that plaintiffs' landfills would suffer financial ruin from the operation of state law; and (3) plaintiffs have not marketed or reused the sewage sludge composted at their sites. As a general matter, the clean hands doctrine requires a party who seeks equitable relief to show that his conduct has been fair, equitable and honest as to the particular matter. 27A *Am.Jur.2d* § 126 (1996). The doctrine is not to be used, however, to punish a party for wrongful, immoral or illegal acts. *Id.* The doctrine is to be applied in the interest of the public and to protect the court and the defendant. *Id.* The application of the doctrine is left to the court's discretion. *Id.* In *Mas v. Coca–Cola Co.*, 163 F.2d 505,

509 (4th Cir.1947), the Fourth Circuit indicated that the clean hands doctrine is to be applied not for the protection of the parties, but for the protection of the court.

■■■■ None of the allegations made by defendants concerning plaintiffs' conduct persuade this Court that the clean hands doctrine should be applied in this case. It is this Court's opinion that the constitutional issues involved in this case should be addressed, and any alleged misconduct of the plaintiffs should not deter this Court from ruling upon those constitutional issues. Although the clean hands doctrine is available to this Court, this Court does not believe that this Court is in need of the doctrine's protection or that defendants will be unfairly prejudiced if this Court proceeds forward to a decision on the merits. Accordingly, the motion of the Secretary and Attorney General to dismiss the complaint on the basis of unclean hands is DENIED.

### XIII. *Environmental Defendants' Motion for Partial Summary Judgment*

Defendants McCoy and Smith (hereinafter "environmental defendants") seek partial summary judgment in their favor on plaintiffs' substantive due process claim, equal protection claim, and 42 U.S.C. § 1983 claim.[11] This Court will address each of these matters in turn.

1. *Motion for Partial Summary Judgment on Substantive Due Process Claims*

In their complaint for declaratory judgment and permanent injunction, plaintiffs assert that the procedures mandated by W.Va. Code §§ 24–2–1c(b) through (f), 20–9–12a, 20–9–12b(a) and (b), 20–9–12c(a)(2) and (b), 20–9–12d(a)(2) and (b), 20–9–12e(a)(1) and (b), and 20–5F–5(g) for siting, spatially increasing and expanding the tonnage received by landfills or composting facilities violate the plaintiffs' substantive due process rights.[12] Further, the complaint asserts that

**11.** The environmental defendants also argue that the preliminary injunction in effect in this matter should be dissolved under the clean hands doctrine. This Court has addressed the unclean

hands argument in a separate part of this opinion.

**12.** Although the environmental defendants make arguments related to procedural due process

tonnage caps placed upon solid waste by W.Va.Code §§ 20–5F–4c (now § 22–15–8), and 20–9–2(c) & (d) (now §§ 22C–4–2(d) & (e)), the inclusion of sewage sludge in the calculation of those tonnage caps by W.Va. Code § 20–5F–2b(e) (now § 22–15–20(e)), and the requirements that plaintiffs dispose of locally generated solid wastes at their facilities by W.Va.Code § 20–5F–5(f) (now § 22–15–10(f)) violate plaintiffs' substantive due process rights. The environmental defendants assert that because no fundamental right is implicated by the above-mentioned statutes, the legislation is entitled to a deferential review and is only unconstitutional if the legislation is not rationally related to a legitimate governmental purpose. Accordingly, the environmental defendants assert that because the legislation has a rational relationship to a legitimate governmental purpose, there is no constitutional violation. This Court agrees with the environmental defendants that plaintiffs' substantive due process claims must fail.

■■■■■■ In order to invoke the substantive due process guarantees of the Fourteenth Amendment, a plaintiff must show that a constitutionally protected property interest or a fundamental right is at stake. *Bass Plating Co. v. Windsor*, 639 F.Supp. 873, 879 (D.Conn.1986). If a fundamental right is affected by the acts of the legislature, the court will apply strict scrutiny to the legislation at issue. Economic legislation, on the other hand, is entitled to the most deferential level of judicial scrutiny. *Eastern Enterprises v. Chater*, 110 F.3d 150, 156 (1st Cir.1997). Where "a piece of legislation is purely economic and does not abridge fundamental rights," the legislation is constitutional under the due process clause "if any rational basis conceivably exists for it . . . ."

The list of rights which courts have found to be fundamental is a short one and includes freedom of association, the right to vote and to participate in the electoral process, the right to interstate travel, the right to fair criminal procedures, the right to fairness in procedures concerning individual claims

against governmental deprivations of life, liberty or property, and the right to privacy. Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law*, § 15.7 (2d ed.1992). While the right to dispose of waste in landfills has been held to be a protected property interest for substantive due process purposes, *Bass Plating Co.*, 639 F.Supp. at 879, this Court has discovered no case that has construed the right to dispose of solid waste to be fundamental. Further, other cases have rejected the notion that a violation of the Commerce Clause invokes strict scrutiny provisions under substantive due process jurisprudence. *See Poor Richard's, Inc. v. Ramsey County, Minn.*, 922 F.Supp. 1387 (D.Minn.1996) (challenge to solid waste ordinance under commerce clause substantive due process provisions evaluated under "rational basis" test).

■■■■ This Court finds that the legislation challenged by plaintiffs does not involve a fundamental right. While plaintiffs have constitutionally protected property interests in engaging in the business of disposing of solid waste and composting sewage sludge, those interests are not "fundamental rights" as delineated by the United States Supreme Court. Accordingly, the legislation challenged by plaintiffs is entitled to deferential review and will be unconstitutional under the due process clause only if the legislation has no rational relation to a legitimate government interest.

■■■■ The statutes implicated in plaintiffs' due process clause challenge prescribe stringent regulatory hurdles for the siting and expansion of landfills and composting facilities, impose tonnage caps on solid waste and sewage sludge, and require that the plaintiffs meet the local needs of solid waste disposal. However, the West Virginia legislature has articulated legitimate purposes for the legislation. Specifically, the legislature has indicated that the above-mentioned statutes are designed to, among other things, "control[ ] all phases of solid waste management," W.Va.Code § 22–15–1(a), and that the procedures mandated by the statutes are "to pro-

---

claims in their motion for summary judgment, plaintiffs clearly limited their due process challenge to substantive due process concerns. Accordingly, this Court will not address procedural due process jurisprudence or its application, if any, to this matter.

tect public health and welfare .... and to reduce ... solid waste management problems." W.Va.Code § 22C–4–1. Plaintiffs do not appear to dispute that the statutes can accomplish the purposes suggested by the legislature, nor does this Court find that it is inconceivable that the legislation could accomplish those purposes. Further, this Court finds that the protection of the health and welfare of the citizenry and the reduction and control of solid waste management problems are legitimate government interests. *Bass Plating Co.,* 639 F.Supp. at 879 (objectives of preventing hazardous contamination from waste disposal and efficient management of waste legitimate government interests). Under the standard of judicial review afforded to economic legislation challenged as violative of substantive due process, this Court finds that the statutes challenged by the plaintiffs do not violate the Due Process Clause because they are conceivably related to legitimate government interests.[13] Accordingly, the environmental defendants' motion for partial summary judgment is GRANTED as to the substantive due process claims.

2. *Motion for Partial Summary Judgment on Equal Protection Claims*

In the complaint, plaintiffs allege that the landfill siting, spacial increase, tonnage increase and change of landfill classification statutes violate the Equal Protection Clause. Additionally, plaintiffs assert that the referenda provisions of these statutes violate the Equal Protection Clause. Further, plaintiffs assert that the application of solid waste assessment fees to nonlandfilled sewage sludge and the tonnage caps placed upon solid waste and sewage sludge disposal violate the Equal Protection Clause. The environmental defendants argue that because the legislation is not based upon any suspect classification, the legislation is not subject to

strict scrutiny, and the statutes are unconstitutional only if they are not rationally related to a legitimate government interest. Further, defendants argue that the statutes are rationally related to a legitimate government interest. This Court agrees with the environmental defendants that plaintiffs' equal protection claims must fail.

In *Chambers Med. Tech. of S.C., Inc. v. Bryant,* 52 F.3d 1252 (4th Cir.1995), the Fourth Circuit reviewed Equal Protection Clause jurisprudence in the context of state statutes regulating waste disposal. The court first noted that waste disposal regulations do not classify matters on the basis of a suspect class or burden as to a fundamental right. *Id.* at 1262. Thus, the court held that the statute at issue must be " 'presumed to be valid and will be sustained if the classification ... is rationally related to a legitimate state interest.' " *Id.* (citations omitted). The court further noted that in determining whether a statute violates the Equal Protection Clause the test to be applied is "whether the goals the State sought to advance were legitimate" and "whether it was 'reasonable for the lawmakers to believe that the use of the challenged classification would promote that purpose.' " *Id.* at 1262–63. (citations omitted).

As in *Chambers,* this Court finds that the statutes challenged by plaintiffs are not based upon a suspect classification and do not burden a fundamental right. As noted above, the right to dispose of waste, while a property right, is not a fundamental right. Further, the suspect classifications—race, national origin, and gender—are not implicated by the statutes. Accordingly, this Court must apply the rational relationship test to the statutes challenged by plaintiffs.

The West Virginia Legislature articulated a legitimate government purpose in enacting the procedures for siting and expanding solid

---

**13.** Plaintiffs appear to raise a due process challenge to other statutory provisions in their motion for declaratory judgment and permanent injunction. However, this Court finds that challenges to those statutes are not properly pled. Plaintiffs have not specifically challenged those statutes in their complaint and cannot now raise issues with regard to those statutes without amending the complaint to apprise defendants of

the specific statutory provisions challenged. Plaintiffs have not moved to amend their complaint and this Court has not otherwise amended the complaint. Accordingly, this Court's opinion addresses only those statutes specifically cited in the complaint and does not review those statutes subsequently raised in the motion for declaratory judgment and permanent injunction.

waste and sewage sludge composting facilities and in imposing tonnage caps on non-landfilled sewage sludge. In the statute, the legislature noted that the purpose of the solid waste management act was to "establish a comprehensive program of controlling all phases of solid waste management." W.Va. Code § 22–15–1(a). Additionally, the statute which sets forth the procedural requirements for changing facility classifications and imposing tonnage caps upon Class A and Class B facilities indicates that the legislative purpose of the statute, at least in part, is to "protect public health and welfare by providing for a comprehensive program of solid waste collection, processing, recycling and disposal [and] to reduce solid waste management problems...." W.Va.Code § 22C–4–2. It is clear to this Court that the legislature, on the face of the legislation, has set forth legitimate governmental purposes.

As noted by the Fourth Circuit, once the court determines that a legitimate government purpose has been articulated, the court must consider whether there "is no reasonable conception that could justify the state's action and whether the legislative actors were cognizant of this at the time they acted. In the absence of such arbitrary and irrational behavior on the part of the legislature, the statute must survive rationality review." *Chambers,* 52 F.3d at 1263. The plaintiffs bears the burden of showing that the statutes are not rationally related to the government purpose. *Id.*

In this case, this Court finds that the overall limitation on the amount of sewage sludge processed and solid waste disposed of in West Virginia is rationally related to the defendants' purpose of protecting public health. By imposing such caps, the government has limited the amount of waste being disposed of in the state. Further, this Court finds that the procedures set forth in the statutes for siting, expanding and changing classification of solid waste disposal sites is rationally related to the legitimate government purpose of establishing a comprehensive system for waste management as articulated in the statute. Plaintiffs have not met their burden of showing that the classifications set forth in the statute do not promote the legislative purpose. Accordingly, the Environmental Defendant's motion for partial summary judgment on plaintiffs' equal protection claims is GRANTED.

### 3. *Referenda Provisions*

With regard to the referenda provisions, to the extent that they are properly challenged in the complaint, this Court finds that the referenda provisions do not violate either the Equal Protection Clause or Due Process Clause. Under both clauses, the referenda must be shown to be rationally related to a legitimate state interest. The cases of *Salyer Land Co. v. Tulare Lake Basin Water Storage Dist.,* 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973), and *Lockport v. Citizens for Comm'ty Action at the Local Level, Inc.,* 430 U.S. 259, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977), establish that limiting a vote to a certain constituency is not per se unconstitutional. Rather, if a referendum is rationally related to a legitimate state interest, it is constitutional. In *Salyer,* the court found that the state properly limited an election of members of the board of directors of a water storage district to landowners rather than enfranchising all residents. The court noted that although "residents of the district may be affected by [the board's] activities .... [l]andowners as a class were to bear the entire burden of the ... costs, and the State could rationally conclude that they, to the exclusion of residents, should be charged with the responsibility for its operation." 410 U.S. at 731, 93 S.Ct. 1224. Further, in *Geo–Tech Reclamation Indus., Inc. v. Hamrick,* 886 F.2d 662, 666 (4th Cir.1989), the Fourth Circuit indicated that the valid state interest in protecting public welfare encompassed legislation designed to protect communities from the "deleterious effects of [solid waste] facilities on more inchoate community values."

Here, the referenda statutes do not violate the Equal Protection Clause or the Due Process Clause. It is conceivable that the legislature could have believed that the referenda provisions would serve the legitimate interest of the state in protecting communities against the adverse effect of solid waste facilities. Further, the state could le-

gitimately confine the referendum to the county where such a waste facility would be located because that county would "bear the costs" of the waste facility. Accordingly, this Court finds that the referenda provisions do not violate the Equal Protection Clause or Due Process Clause.

### 4. *Motion for Summary Judgment on Plaintiffs' 42 U.S.C. § 1983 Claims*

The environmental defendants appear to contend that plaintiffs' civil rights claims under 42 U.S.C. § 1983 should be dismissed because plaintiffs' underlying constitutional claims are without merit. To the extent that plaintiffs' civil rights claim is based upon equal protection or substantive due process, defendants' motion for summary judgment on the civil rights claim is GRANTED IN PART. However, as conceded by the environmental defendants, dormant commerce clause claims are viable under § 1983. Thus, because this Court finds, as discussed below, that plaintiffs' commerce clause challenges have merit, the environmental defendant's motion for partial summary judgment is DENIED IN PART.

### XIV. *Plaintiffs' Motion for Declaratory Judgment and Permanent Injunction*

### 1. *Preliminary Matters*

This Court first notes that plaintiffs challenge the statutes regarding "free days" and undifferentiated solid waste fees applied to solid waste in their motion for declaratory judgment and permanent injunction, but plaintiffs do not question the constitutionality of the statutes in their complaint. Additionally, plaintiffs seem to challenge the referenda provisions under the West Virginia Constitution in their motion for declaratory judgment and preliminary injunction but do not raise these provisions in their complaint. Although plaintiffs wish to raise these claims at this juncture, this Court finds that without a motion to amend the complaint to add these claims and an order granting such motion, plaintiffs cannot now raise these claims as a basis for relief. Thus, this Court will not address the merits of these statutes and DENIES the motion for declaratory re-

lief and permanent injunction with regard to these statutes as improperly pled.

Second, defendants Secretary of Tax and Revenue and Attorney General argue that plaintiffs' motion should be dismissed because plaintiffs' have not filed the "appropriate pleading" to bring plaintiffs' claims to the court for disposition. While this Court agrees with defendants that plaintiffs would have been more procedurally correct to have filed a motion for summary judgment rather that a motion for declaratory judgment and permanent injunction, this Court finds that there will be no unfair prejudice resulting to defendants if this Court construes plaintiffs' motion as a motion for summary judgment.

The parties in this case engaged in a lengthy discovery period which permitted both plaintiffs and defendants to investigate plaintiffs' claims and defendant's defenses. Further, the motion for declaratory judgment and permanent injunction was filed after discovery had concluded, and defendants have had more than an adequate opportunity to respond to the motion. Additionally, even if this Court made a formal Fed.R.Civ.P. 56 conversion of this motion to a motion for summary judgment, this Court finds that defendants have had a reasonable opportunity to present all pertinent material to this Court to assist it in rendering its decision, and that all of the pleadings are sufficient for this Court to make a fair judgment on the merits of plaintiffs' claims.

Defendants suggest that certain affidavits and exhibits used by the plaintiffs in support of their motion have been ruled by this Court to be inadmissible and, in any event, are disputed by defendants. However, this Court relies only upon those facts set forth by this Court in the "Undisputed Facts" portion of this order, and those facts do not include the affidavits or exhibits challenged by defendants. Accordingly, defendants are not unfairly prejudiced by the motion to the extent it relies on facts to which defendants have not had an adequate opportunity to respond.

Further, this Court believes that defendants' motion may be somewhat inappropriate to the extent that it was filed more than five months after plaintiffs' motion was filed.

Any procedural deficiencies in plaintiffs' motion would have been instantly apparent to defendants, and any motion objecting to a procedural error should have been filed promptly.

Finally, although plaintiffs have perhaps inartfully drafted their motion, this Court thinks it is discretionary whether this Court should dismiss the motion on procedural grounds. After considering the length of time this matter has been pending and the lack of unfair prejudice that will result due to plaintiffs' procedural missteps, this Court finds that the equities weigh in favor of deciding the motion on its merits rather than inevitably repeating the briefing schedule. Accordingly, this Court hereby CONSTRUES plaintiffs' motion for declaratory judgment and permanent injunction as a motion for summary judgment and will apply the summary judgment standards to the motion.

### 2. *Discussion*

Having now decided all other motions pending and issues raised, this Court now turns to the core of this litigation: whether West Virginia's solid waste and sewage sludge statutes violate the Commerce Clause of the United States Constitution. While this case has not been a particularly easy one in which to apply dormant commerce clause jurisprudence, this Court is firmly convinced that the statutes challenged by plaintiffs, when examined *in toto*, discriminate against interstate commerce in their purpose and in their effect.

The Dormant Commerce Clause applies to state regulation of processing and disposal of waste. *National Solid Wastes Mgmt. Assoc. v. Meyer*, 63 F.3d 652 (7th Cir.1995). In *Chambers Med. Tec. of S.C., Inc. v. Bryant*, 52 F.3d 1252, 1256 (4th Cir. 1995), the Fourth Circuit noted that the "'negative' commerce clause prohibits states from enacting legislation that 'unjustifiably ... discriminate[s] against or burden[s] the interstate flow of articles of commerce.'" (quoting *Oregon Waste Sys., Inc. v. Department of Envt'l Quality*, 511 U.S. 93, 114 S.Ct. 1345, 1349, 128 L.Ed.2d 13 (1994)). Whether a statute unjustifiably discriminates against

interstate commerce is determined "by one of two tests depending on the type of regulation at issue." *Id.*

First, if a state statute discriminates against interstate commerce on its face, in its practical effect, or in its purpose, "a 'virtually per se rule of invalidity'" applies. A statute discriminates against interstate commerce when it provides for "differential treatment·of in-state and out-of-state economic interests that benefits the former and burdens the latter." In order to pass constitutional muster under this heightened scrutiny, the state must demonstrate that "the discrimination is demonstrably, justified by a valid factor unrelated to economic protectionism," and that there are no "'nondiscriminatory alternatives adequate to preserve the local interests at stake.'" Second, if a state law "regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."

*Id.* at 156–57, 114 S.Ct. 1345 (citations omitted). Other courts, in considering the validity of state statutes regulating solid waste have noted that the "'critical consideration is the overall effect of the statute on both local and interstate activity.'" *Meyer*, 63 F.3d at 658. (citations omitted). The Supreme Court has held that there is "no valid health and safety reason for limiting the amount of waste that a landfill operator may accept from outside the state, but not the amount that the operator may accept from inside the state." *Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dept. of Nat. Res.*, 504 U.S. 353, 367, 112 S.Ct. 2019, 119 L.Ed.2d 139 (1992).

Having now reviewed the test to be applied to the challenged statutes under the Commerce Clause, this Court finds that the per se invalidity test establishes that all of the challenged statutes violate the Commerce Clause. Each category of statues will be reviewed below.

### a. *Preference of Local Waste and Tonnage Caps*

W.Va.Code § 20–5F–5(f) (now § 22–15–10(f)) requires that a commercial solid

waste facility first ensure the disposal needs of the local area (referred to as "the county" in the repealed version of the statute and as "the wasteshed" in the version currently in effect) are met. The statute also allows the local solid waste authority to modify the permit of the solid waste facility to reduce the total monthly tonnage of out-of-county or out-of-wasteshed waste that the facility may accept if the authority determines that the present or future local disposal needs will not be met. Additionally, W.Va.Code § 20–5F– 4c (now § 22–15–8) and §§ 20–9–2(c) & (d) (now §§ 22C–4–3(d) & (e)) impose tonnage caps upon the amount of solid waste a commercial solid waste facility can handle per month. This Court finds that these statutes clearly discriminate against interstate commerce in their purpose, effect, and on their face, and that there are other nondiscriminatory alternatives that would serve the legitimate interests of the state in enacting this statute.

Two Fourth Circuit cases have discussed the validity of tonnage caps imposed upon solid waste disposal. In *Chambers,* the plaintiffs challenged a South Carolina statute that placed a cap on the amount of infectious waste that an incineration facility could burn on an annual basis. The level of the cap was based upon the amount of infectious waste to be generated in South Carolina during the year. 52 F.3d at 1257. Reviewing the district court's conclusion that the cap did not violate the Commerce Clause, the Fourth Circuit reviewed the United States Supreme Court's jurisprudence and noted that "state regulations prohibiting the disposal of or imposing increased burdens on waste merely because it is generated out-of-state violate the Commerce Clause, but the court has indicated that an evenhanded, nondiscriminatory limitation on the amount of waste disposed of that does not discriminate on the basis of the waste's origin would pass constitutional muster." *Id.* at 1258. Accordingly, the Court held that although the cap was tied to the amount of production of in-state waste, this factor alone did not make the statute constitutional because "nothing would prohibit" any commercial incineration facility "from choosing to incinerate infectious waste generated out-of-state to the exclusion of waste

generated in state." *Id.* Thus, because the statute uniformly burdened both in-state and out-of-state infectious waste, the statute did not discriminate against the Commerce Clause "on its face or in its practical effect." *Id.*

Also, the court reviewed the statute to see if the legislature had a discriminatory purpose in enacting the cap. *Id.* at 1259. The court noted that the legislature did not include a statement of purpose in the legislation. *Id.* Further, the court could not determine whether the district court found that the legislature had acted with an intent to discriminate. The court noted that if it concluded that the legislature intended to discriminate and applied the more stringent commerce clause test, it would conclude that the statute was unconstitutional. However, under the less restrictive test which would apply if the statute regulated evenhandedly and had only an incidental effect on interstate commerce, the statute would be constitutional because the purposes advanced by the state in enacting the statute included matters of public safety traditionally recognized as an appropriate field of state regulation. Accordingly, the court remanded the matter to the district court for a determination of whether the legislature had acted with discriminatory intent. *Id.* at 1259–60, 1266.

First, with regard to the purposes of the statute, the legislative findings and purposes set forth as part of Chapter 5F (now Chapter 15) indicate that the legislature enacted the statutes to avoid "the imporation and disposal in the state of … wastes … from other states by persons … who wish to avoid the costs … for … disposal of such wastes in the state of origin." W.Va.Code § 20–5F– 1(d) (now § 22–15–1). W.Va.Code § 20–9–1 sets forth a similar finding. Unlike the findings in *Chambers,* these findings alone are enough to convince this Court that the legislature intended to discriminate against interstate commerce in enacting the statutes.

Further, this Court finds that the effect of the legislation is to discriminate against interstate commerce. By requiring solid waste facilities to prefer local waste over out-of-state waste, the statute clearly disfavors in-

terstate commerce. Additionally, because it permits a local solid waste authority to modify a permit to reduce the amount of out-of-county or out-of-wasteshed waste that a landfill reserves to meet the needs of local waste, the effect of the statute is to discriminate against interstate commerce. · Although some in-state garbage may be affected by the statute limiting the amount of out-of-county and out-of-wasteshed waste that can be received by a given landfill, the effect of the statute still works to limit the amount of out-of-state solid waste that the landfill can receive. This kind of statute when coupled with a local waste preference is clearly unconstitutional. *See Oregon Waste Sys. v. Department of Envtl. Quality,* 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994) (state may not accord its own inhabitants preferred right of access over consumers in other states to natural resources located within its borders).

Further, with regard to the tonnage caps, it is clear that, when read in conjunction with the requirement that commercial solid waste facilities meet local disposal needs first, the tonnage cap, although appearing to be neutral on its face, discriminates against interstate commerce in its effect. When read in conjunction with the local preference, the tonnage caps impose a limitation on out-of-state waste that is not imposed upon in-state waste. Unlike the situation in *Chambers,* solid waste facilities cannot choose to fullfill the cap by preferring out-of-state waste to in-state waste. Rather, facilities are required to first accept in-state waste, leaving only the amount between the tonnage cap and the local case for out-of-state waste. *Chambers* clearly establishes that this is unconstitutional.

Finally, this Court finds that the local preference statute is discriminatory on its face. The statute explicitly indicates that a preference be given to local waste and that waste generated from other locations be limited to ensure that local waste can be accommodated. The Commerce Clause clearly prohibits such preferential treatment of local waste.

Having found that the statutes violate the Commerce Clause in purpose, in effect and on their face, this Court turns to the question of whether there is a legitimate noneconomic reason for the legislation and whether nondiscriminatory methods for meeting these interests exist. First, this Court finds that the state's interests in public health and welfare are legitimate reasons for enacting legislation that limits the amount of waste disposed of in West Virginia. In fact, the legislature indicates this in its legislative findings and purposes. However, as noted in *Fort Gratiot,* there is no legitimate health and safety reason for limiting the amount of waste that can be accepted from out-of-state but not from in-state. 504 U.S. at 367, 112 S.Ct. 2019. Additionally, the statute suggests it limits the amount of waste to preserve West Virginia's natural resources. Courts have held that the preservation of natural resources is the same as economic protectionism and is not a legitimate state interest. The state's legitimate interest in protecting public health and welfare could be effectuated by an evenhandedly applied limitation on the amount of *all* wastes, whether generated in- or out-of-state, that could be disposed of in West Virginia.

b.  *Application of Solid Waste Assessments and Tonnage Caps to Sewage Sludge*

■ W.Va.Code § 20–5F–2b(e) (now § 22–15–20(e)) makes the solid waste assessment fees and the tonnage caps applicable to solid waste applicable to sewage sludge that is composted, but not landfilled, at commercial solid waste facilities. For the same reasons set forth above, this Court finds that, in its legislative findings and purpose, the legislature indicated that its purpose in enacting this legislation was discriminatory. This Court also finds that the application of the tonnage caps has the effect of discriminating against interstate commerce.

While the statute initially appears to treat in-state and out-of-state sewage sludge evenhandedly, a closer look at the application of the statute indicates its discriminatory effect. Under the statute, a "solid waste facility" includes "composting facilities." "Composting facilities" do not include facilities for composting solid waste that are located at the site where the waste was generated.

Thus, because they all process sewage sludge which is generated in-state and on-site, POTWs are excluded from the cap. Valero and Lackawanna, the only permitted composting sites, compost out-of-state sewage sludge that is not generated on-site. Thus, the statute has the effect of limiting the amount of out-of-state sewage sludge composted in West Virginia while placing no limitation on the amount of in-state sewage sludge that can be processed. This is precisely the type of legislation forbidden by the Commerce Clause.

Additionally, assessment fees apply only to those entities meeting the definition of a "composting facility." Because POTWs do not meet this definition, they are not required to pay the fee. Thus, the assessments are not evenly applied to facilities that compost in-state sewage sludge and out-of-state sewage sludge. This disparate treatment, too, is forbidden by the Commerce Clause.

This Court further finds that there is no legitimate non-economic reason for placing caps and fees on out-of-state sludge and not on in-state sludge exists. While the state has a legitimate interest in regulating the flow of waste within its borders, it cannot do so at the expense of out-of-state interests. The legitimate goals of the state could be met by a tonnage cap and a fee structure that applied evenhandedly to all composted sewage sludge.

c. *Wastes of "Unknown Origin"*

In W.Va.Code § 20–5F–1(c) (now § 22–15–1(c)), the legislature indicated that it was in the interest of the public health, safety, and welfare to identify the origin of solid waste accepted for disposal in West Virginia. This finding is facially discriminatory. Waste generated in-state is not from an "unknown origin," and the implication of the statutory finding is that out-of-state waste is "unknown." Accordingly, this Court finds that the legislative finding is unconstitutional because it discriminates against out-of-state waste.

Further, the state has not shown a legitimate purpose that could not be met without the discriminatory statute. It would be legitimate for the state to require that all waste

be subject to some kind of analysis to determine its content. This requirement would serve to protect public health and welfare by ensuring that dangerous wastes were not disposed of in unsuitable landfills. However, this Court can find no relation between identifying the origin of waste and the need of the state to protect public health or regulate the solid waste industry. Identifying the geographic origin rather than the composition of the waste does no more than permit the state to determine if the waste is generated in-state or out-of-state. Such a practice is clearly unconstitutional.

d. *Certificates of Need and Procedures for Opening, Siting, Expanding or Increasing the Volume of Solid Waste Facility*

W.Va.Code § 20–5F–5(g) (now § 22–15–10(g)) requires that in order to open a new facility or to expand an existing solid waste facility, the public service commission must grant a certificate of need. In considering whether the certificate of need should be granted, the PSC considers, among other things, the "total tonnage of solid waste generated within the county" and "total tonnage of solid waste generated within the wasteshed." W.Va.Code § 24–2–1c. Additionally, the statute directs the PSC to deny a certificate of need if, among other things, the "proposed capacity [of the facility] is unreasonable in light of demonstrated needs" or the location of the facility "is inconsistent with any . . . solid waste management plan." *Id.* Further, the statute indicates that the granting of a certificate of need is conditioned upon the acceptance by the facility of solid waste generated within the county and wasteshed. *Id.*

W.Va.Code §§ 20–9–12a (now § 22C–4–24), 20–9–12b(a) (now § 22C–4–25(a)), 20–9–12c (now § 22C–4–26), 20–9–12d (now § 22C–4–27), 20–9–12e (now § 22C–4–28), set forth the procedures for opening, spatially expanding, or increasing the volume of a solid waste facility. The statutes first require that a certificate of need be obtained from or modified by the PSC. Second, approval must be obtained from the local solid waste authority. Third, approval must be

obtained from the county commission.[14] Fourth, a referendum must be held to determine if the voters of the county in which the facility is or will be located want a new or larger facility in the county. No criteria are set forth in the statute indicating what considerations should be made by the various entities in determining whether to approve or to deny the application. Finally, W.Va.Code § 20–9–12a (now § 22C–4–24) requires each county or regional waste authority to prepare a commercial solid waste facilities citing plan. One criteria the authority must consider in developing its plan is "the efficient disposal of solid waste, including all solid waste generated within the county...."

The Fourth Circuit has addressed the constitutionality of certificate of need statutes as well as certain procedures for increasing the tonnage disposed of at solid waste facilities. In *Medigen of Ky., Inc. v. Public Serv. Comm'n,* 985 F.2d 164 (4th Cir.1993), the court addressed the constitutionality of a statutory provision which required that a hauler of infectious waste obtain a "certificate of convenience and necessity" before hauling infectious waste. The statute required that the Public Service Commission, before granting a certificate, consider "existing transportation facilities in the territory for which the certificate is sought, and in case it finds from the evidence that the service furnished by existing transportation facilities is reasonably efficient and adequate, the commission shall not grant such certificate." *Id.* at 166. Applying the deferential commerce clause balancing test, the court held that "[b]ecause market entry is only permitted if the commission determines that the market is not being adequately served, the certification requirement necessarily limits competition, thereby implicating the dormant commerce clause.... [while] West Virginia's goal of providing universal service at reasonable rates may well be a legitimate state purpose ... restricting market entry does not serve that purpose." *Id.* at 166, 167.

In another Fourth Circuit opinion, the court analyzed the constitutionality of a South Carolina law imposing an overall limit on the amount of waste that could be deposited in landfills within the state. *Environmental Tech. Council v. Sierra Club,* 98 F.3d 774 (4th Cir.1996). The statute provided that the limit could be lifted if it was necessary to "protect the health and safety of the citizens of South Carolina" or if the amount of waste falling within the cap "was generated in South Carolina only." *Id.* at 780. The statute further provided that "[a]ll hazardous waste facilities must reserve for waste generated in-state in at least the same capacity used during the previous year." *Id.* Finally, the statute required that permits to establish or expand hazardous waste facilities were to be granted only on a showing of in-state need. *Id.* at 781.

Applying the *per se* test to the statutes, the court first noted that "[a] state cannot achieve a legitimate economic goal through 'the illegitimate means of isolating the state from the national economy.'" *Id.* at 786. (citation omitted). The court further stated that the law was clear that the Dormant Commerce Clause permits a state to impose "'an evenhanded cap on the total tonnage landfilled' with hazardous waste 'when it curtail[s] volume from all sources.'" *Id.* at 787. (citation omitted). The court then noted that the tonnage cap in question was not evenhanded in its effect because the cap could be lifted based upon the needs of persons within South Carolina, but the same exceptions to the cap were not provided for out-of-state interests.

Further, the court held that the certificate of need requirement was unconstitutional because an application to expand or establish a facility was to be considered only with reference to the level of waste generated within the state. *Id.* at 788. Accordingly, the court held that the effect of the statute was to "prohibit facilities from expanding to meet out-of-state needs, but to allow expansion to meet in-state needs." *Id.*

---

**14.** With regard to increasing the maximum amount of waste that can be handled by a "Class A" facility, the procedure is slightly different. Instead of requesting approval from the county commission, the applicant must seek a "major permit modification" with the West Virginia Division of Natural Resources.

■ This Court first finds that the certificate of need and approval procedures statutes are discriminatory in their purpose. W.Va.Code § 20–9–1, the legislative findings and purposes provision of Article 9 (now Article 4 of Chapter 22C), indicate that the Legislature found that its failure to regulate the solid waste industry resulted in "the importation ... of ... solid waste ... from other states" and that it was the purpose of the legislature to restrict the importation of wastes "which would not be accepted for disposal in the location where such wastes or materials were generated." W.Va.Code § 20–9–1 (now § 22C–4–1). This language indicates that the statutes enacted in this chapter were intended to limit the amount of out-of-state waste being disposed of in West Virginia.

Second, this Court finds that the certificate of need statute is discriminatory in its effect. As in *Medigen*, 985 F.2d 164, the certificate of need is based upon a consideration of the amount of waste generated in-county and in-wasteshed. Nowhere does the statute suggest that the PSC consider the needs of other markets in granting a certificate of need. Further, the statute directs the PSC to deny the certificate of need if the size of the facility is unreasonable in light of demonstrated needs. Because the statute requires the PSC to look at the needs of the county and wasteshed, if the needs of the county and wasteshed are met, a certificate will be denied even if the facility is large enough to accommodate out-of-state waste. This statute has the effect of permitting a facility to expand, or open, to meet in-state needs but not to meet out-of-state needs. This kind of restriction on market entry is unconstitutional.

Further, the statute requires that a certificate of need be conditioned on the facility's accepting in-state waste. Granting a local preference has the effect of limiting out-of-state waste. As set forth above, this type of preference is unconstitutional both on its face and in its effect.

Additionally, the state cannot show that any legitimate purpose it has in enacting the statute cannot be met by nondiscriminatory means. If the state wishes to limit the amount of solid waste disposed of in West Virginia in order to protect the health and safety of its citizens, its certificate of need procedures could take into consideration the out-of-state market as well as the in-state market and should not condition a certificate upon the acceptance of local waste. The type of parochial legislation enacted by the legislature has clearly been disapproved of by the Supreme Court.

■ Further, this Court finds that the statutes setting forth the procedures for obtaining approval for siting and expanding solid waste facilities are unconstitutional. First, the legislature indicated an unconstitutional purpose in enacting the legislation. As noted above, the legislature found that its lack of regulation of the solid waste industry resulted in "the importation ... of ... solid waste from other states" and that it was the purpose of the legislature to restrict the importation of wastes "which would not be accepted for disposal in the location where such wastes or materials were generated." W.Va. Code § 20–9–1 (now § 22C–4–1). It is clear that under the Commerce Clause such procedures cannot be enacted to limit the acceptance of out-of-state waste while not so limiting in-state waste. Further, the procedures make reference to the certificate of need requirements which this Court has determined to be unconstitutional. Additionally, the criteria that local governing bodies must apply under the procedural statutes in granting or denying local approval include "the efficient disposal of solid waste generated within the county or region...." § 22C–4–25. This criteria clearly has the effect of barring from consideration wastes generated outside the county or region.

Further, as with the other statutes discussed herein, this Court finds that the state has not shown that its legitimate interests cannot be met by nondiscriminatory legislation. Here, procedures could be enacted without a discriminatory purpose. Further, the statute could take into consideration both in-state and out-of-state solid wastes and their efficient disposal. These types of amendments would serve the state's legitimate goals and would not be discriminatory.

■ Plaintiffs have also specfically challenged the referenda provisions of the statutes. This Court finds that the referenda provisions in the challenged statutes violate the Dormant Commerce Clause. In *SDDS, Inc. v. South Dakota,* 47 F.3d 263 (8th Cir. 1995), plaintiff, a corporation which sought to construct and operate a solid waste disposal facility in South Dakota, challenged a state referendum that defeated plaintiff's attempt to construct a solid waste facility in the state. The Eighth Circuit found that the referenda statute did not discriminate against out-of-state solid waste on its face. *Id.* at 272. However, the referendum did discriminate against interstate commerce in its purpose and effect. *Id.* The court noted that South Dakota required both administrative and legislative approval for the construction of solid waste facilities. *Id.* at 269. This system was determined to be unconstitutional by the court because, even if South Dakota could show that there were legitimate reasons for this "dual process," the state could not show that "the referendum ... in any way furthered the state's legitimate concerns...." *Id.* at 269. Further, the court found that the referendum statute did not provide any standards to guide the electorate in making its determination. *Id.* Thus, "because the voters were not provided with any meaningful criteria, the defeat of the referred measure [could not] be seen as improving environmental protection." *Id.* at 270.

Ruling in the alternative, the court found that the referendum statute had a discriminatory effect. The court evaluated the nature of the solid waste disposal market in South Dakota and determined that new facilities built in South Dakota would have to be large in scale to recover the costs imposed by environmental regulations, and that most of the waste to fill these landfills must come from out-of-state. *Id.* at 270–71. Thus, the court found that the market was such that the referendum would affect predominantly out-of-state solid waste. *Id.* at 271.

Applying strict scrutiny to the referenda statute, the court held that "the referendum fails both prongs of this test because the record demonstrates that (1) the denial of legislative approval by the referendum

does not further the legitimate goals of environmental safety, and therefore provides no local benefits; and (2) a nondiscriminatory alternative is available because legislative review [may be obtained otherwise.]" *Id.*

While not directly on point, this Court finds that *SDDS* is sufficiently similar to this case to support this Court's finding that the referenda statute violates the Dormant Commerce Clause. First, this Court finds that the referenda statute discriminates against out-of-state solid waste in both purpose and effect. The statute imposes upon plaintiffs numerous levels of administrative and legislative review in order to obtain a permit to site or expand a solid waste facility. These provisions provide significant detail as to what the administrative and legislative bodies must consider before they can grant a permit. Clearly, the legitimate interests of the state in protecting public health and safety can be met by fulfilling these criteria.

However, this Court finds that the extra requirement that a solid waste facility undergo referenda approval does not serve any legitimate state interest. There is no indication that the referenda process adds any measure of protection to public health and safety that is not encompassed by other administrative and legislative processes. Thus, this Court can find no purpose for the referenda provision other than to draw upon adverse public sentiment in the approval process.

Additionally, as in *SDDS,* this Court finds that the referenda provisions provide no standards to guide the electorate in making its determination as to whether it desires a solid waste facility to be constructed in the state. It was such "standardless review" that the *SDDS* court indicated was prohibited. Thus, this Court finds that because the voters in this state are not provided with meaningful criteria in considering the siting or expansion of solid waste facilities in West Virginia, the referenda statute is discriminatory in its purpose.

Likewise, this Court finds that the statute is discriminatory in its effect. Like the circumstances in SDDS, the solid waste disposal market is such that any new facilities built in

the state inevitably must be constructed to accept large amounts of solid waste in order to recoup the investment made to meet environmental requirements. Additionally, the amount of waste produced in West Virginia is relatively small, and any shortfall in the capacity of the disposal sites would be made up with out-of-state solid waste. Additionally, the solid waste facilities have been obligated, unconstitutionally, to meet the needs of the wasteshed before marketing its capacity to out-of-state consumers. This Court finds that the only effect the referenda provisions could have is to permit the voters to either accept or reject the construction or expansion of a facility that will accept out-of-state waste.

Not only are the referenda provisions discriminatory in both purpose and effect, the state has failed to show that there are no nondiscriminatory means available to meet their legitimate purposes. Here, the statutes which regulate the siting and expansion of solid waste facilities on an administrative and legislative level list factors which encompass the state's legitimate goals of protecting the public health and welfare. Although, as stated above, the approval process includes constitutionally infirm considerations, the bulk of the considerations, if set forth in an otherwise constitutional statute, are adequate to protect public health and welfare. Additionally, the state could further its legitimate goals by enacting even more stringent requirements for the expansion and siting of solid waste facilities, if those requirements further the state's legitimate interest in regulating the solid waste industry and protecting public health and safety and apply evenhandedly to both in-state and out-of-state waste. Accordingly, this Court finds that the referenda statutes are unconstitutional.

Accordingly, the motion for declaratory judgment and permanent injunction is GRANTED IN PART as follows: the following statutes [15] are unconstitutional under the Dormant Commerce Clause and defendants are enjoined from enforcing them: W.Va. Code §§ 22–15–1(c), 22–15–8, 22–15–10(f), 22–15–10(g), 22–15–20(e), 22C–4–2(d) & (e),

22C–4–24, 22C–4–25, 22C–4–26, 22C–4–27, 22C–4–28, and 24–2–1c.

### XV. *Outstanding Motions for Sanctions*

Both this Court and Magistrate Judge David L. Core advised the parties that the outstanding motions for sanctions would be considered after this Court decided the merits of plaintiffs' claims. Accordingly, the parties should advise Magistrate Judge Core on or before *September 29, 1997* if they intend to pursue any motions of sanctions currently pending. If the parties so advise Magistrate Judge Core, he will either decide the motions for sanctions or set the motions for a hearing.

### XVI. *§ 1983 Motion for Attorney's Fees*

In their complaint, plaintiffs requested attorney's fees. Earlier, this Court determined that plaintiffs' "substantially prevailed" in this action. However, upon further consideration, and in light of this opinion, this Court finds that it would benefit from additional briefing on the issue before it determines whether plaintiffs have "substantially prevailed." However, this Court will stay its decision on the attorney's fee issue if the parties appeal this decision. Moreover, this Court believes that it would be a potential waste of judicial resources for this Court to rule upon the attorney's fees and costs issue prior to the resolution of any appeal by the Fourth Circuit. Even if the plaintiffs are presently prevailing parties, it is possible that they may not be after any appeal is resolved. *See Hicks v. Southern Md. Health Sys. Agency,* 805 F.2d 1165, 1167 (4th Cir. 1986). If no notice of appeal is filed, this Court will set a briefing schedule on the attorney's fees issue.

The Clerk is directed to transmit copies of this order to counsel of record herein.

---

**15.** All statutory references made are to statutes currently in effect.